STATE ex rel. ALMA TELEPHONE
COMPANY, et al., Respondents,

v.

PUBLIC SERVICE COMMISSION
OF THE STATE of Missouri,
Appellant,

State ex rel. BPS Telephone Company,
et al., Respondents,

AT & T Wireless Services, Inc.,
et al., Appellants.

No. SC 86529.

Supreme Court of Missouri,
En Banc.

Jan. 10, 2006.

Rehearing and Modification Denied
Jan. 31, 2006.

Marc D. Postom, Public Service Com'n,
Jefferson City, for Appellant.

Alok Ahuja, Paul DeFord, Kurt Schae-
fer, Kansas City, Joseph D. Murphy,
Champaign, IL, Charles W. McKee, Over-
land Park, Kansas, Paul G. Lane, Leo J.
Bub, St. Louis, MO, for Appellees.

Craig S. Johnson, Lisa Cole Chase, W.R.
England, III, Brian T. McCartney, Jeffer-
son City, MO, for Respondents.

STEPHEN N. LIMBAUGH, JR., Judge.

In these two consolidated cases, the Missouri Public Service Commission disallowed a proposal by certain rural telephone companies to amend "access tariffs" to be imposed on several wireless telephone service providers.[1] On petition for writ of review, the circuit court reversed the PSC's decision, and thereafter, the PSC and the wireless service providers appealed. After opinion by the Court of Appeals, Western District, this Court granted transfer. Mo. Const. art. V, sec. 10. The judgment of the trial court is reversed, and the PSC's decision is affirmed.

## I. Facts and Procedural History

This litigation involves a dispute concerning the method by which the rural telephone companies should be compensated for delivering calls that originated from wireless telephones and terminated in the rural companies' local exchanges during February 1998 through January 2001. The telephone traffic at issue involves wireless calls that occurred within one of Missouri's two "Major Trading Areas" (MTA) for telecommunications. Thus, the traffic was intrastate, as well as intraMTA.

Prior to 1998, Southwestern Bell Telephone Company (SBTC), operating as a large interexchange carrier, transported and terminated calls for wireless carriers, or commercial mobile radio service providers (CMRS providers). SBTC charged the CMRS providers a tariff for this service. However, this tariff did not compensate rural local exchange carriers (LECs)—the respondents herein—for completing wireless calls that terminated on their systems. During the early 1990s, the PSC found SBTC liable to the LECs under the LECs' own existing access tariffs. Then in 1998, SBTC was permitted to revise its wireless termination tariffs to eliminate its obligation to pay the LECs, and instead the CMRS providers were to compensate the LECs directly. In this regard, the PSC ordered the CMRS providers to seek reciprocal compensation arrangements with the LECs for the termination of the wireless traffic or, otherwise, to cease delivering wireless traffic to the LECs. Despite this order, few reciprocal arrangements were entered, and CMRS providers continued to transmit wireless originated traffic to the LECs, which were unable to block the wireless calls. In an effort to obtain compensation, the LECs then billed the CMRS providers under existing access tar-

1. In the first case, the rural telephone companies are: Alma Telephone Company, MoKan Dial Inc., Mid–Missouri Telephone Company, Choctaw Telephone Company, Chariton Telephone Company, Peace Valley Telephone Company, Mid–Missouri Telephone Group, and Small Telephone Exchange Group.

In the second case, the rural telephone companies are: BPS Telephone Company, Citizens Telephone Company of Higginsville, Mo., Inc., Craw–Kan Telephone Cooperative, Inc., Elington Telephone Company, Farber Telephone Company, Goodman Telephone Company, Granby Telephone Company, Grand River Mutual Telephone Corporation, Green Hills Telephone Corporation, Holway Telephone Company, Iamo Telephone Company, Kingdom Telephone Company, KLM

Telephone Company, Lathrop Telephone Company, Le–Ru Telephone Company, McDonald County Telephone Company, Mark Twain Rural Telephone Company, Miller Telephone Company, New London Telephone Company, Orchard Farm Telephone Company, Oregon Farmers Mutual Telephone Company, Ozark Telephone Company, Seneca Telephone Company, Steelville Telephone Exchange, Inc., and Stoutland Telephone Company.

In both cases, the wireless services providers are: AT & T Wireless Services, Inc., GTE Midwest Incorporated, Southwestern Bell Telephone Company, Southwestern Bell Wireless, Inc., and Sprint Spectrum L.P. d/b/a Sprint PCS.

iffs, which established the rates that the LECs could charge for completing long distance or toll calls on their local exchanges. However, the CMRS providers refused to pay on the ground that the tariffs did not apply to wireless originated traffic, which the Federal Communications Commission (FCC) deemed to be intraMTA, or local traffic. During that time, though, the LECs did not seek enforcement of the PSC's order requiring the CMRS providers to enter reciprocal compensation arrangements or cease delivering traffic to the LECs.[2]

In 1999, the LECs filed proposed amended access tariffs with the PSC to clarify the tariffs' applicability to wireless originated traffic. Under the proposal, each tariff would be amended as follows:

> The provisions of this tariff apply to all traffic regardless of type or origin, transmitted to or from the facilities of the Telephone Company, by another carrier, directly or indirectly, until and unless superseded by an agreement approved pursuant to 47 U.S.C. 252, as may be amended.

The CMRS providers and SBTC intervened and objected to the tariffs, and after a hearing, the PSC rejected the proposed amended tariffs. The LECs then filed a writ of review with the circuit court, which reversed the decision of the PSC. After an initial appeal to the court of appeals, which reversed and remanded for failure of the PSC to make adequate findings of fact, the PSC again ruled against the LECs, relying on federal regulatory rulings in determining that intraMTA calls are local calls and not subject to access tariffs. The LECs again sought a writ of review in the circuit court, the court again reversed the PSC, and the PSC and CMRS providers then appealed. Both sides agree that the facts are not in dispute and only a question of law remains to be resolved.

## II. Analysis

This case is controlled by the Federal Telecommunications Act of 1996 (FTA), 47 U.S.C. sec. 251 et seq. (2000). The FCC is charged with implementing and enforcing the provisions of the FTA, 47 U.S.C. sec. 201(b) (2000), and FCC regulations and decisions are binding on the industry and state commissions, *AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 377–79, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999).

The FTA requires interconnection, directly or indirectly, between telecommunications carriers. 47 U.S.C. at sec. 251(a). To allow for the recapture of costs for interconnection, the FTA provides for "reciprocal compensation arrangements for the transport and termination of telecommunications," *id.* at sec. 251(b)(5), and implementing regulations place a duty on LECs and wireless carriers to negotiate and enter in to those arrangements, 47 C.F.R. 51.301. In this case, as noted, no such arrangements were completed.

■ The FCC has recently confirmed that in the absence of a reciprocal compensation arrangement, "CMRS providers accept the terms of otherwise applicable state tariffs." *In the Matter of Developing a Unified Intercarrier Compensation Regime; T–Mobile et al. Petition for Declaratory Ruling Regarding Incumbent LEC Wireless Termination Tariffs*, 2005 FCC LEXIS 1212, para. 12 (2005). The access tariffs that the LECs now seek, however, are not "otherwise applicable state tariffs." That question was settled in a FCC ruling known as the "Local Compe-

---

2. However, during oral argument, counsel for the LECs advised the Court that "complaint proceedings" against the CMRS providers for failure to enter into the reciprocal compensation arrangements are now pending before the PSC.

tition Order," issued when the FTA first became effective. *In the Matter of Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, First Report and Order, 11 F.C.C.R. 15299 (1996). In pertinent part, the Order first makes a critical distinction between transport and termination tariffs, which are applicable to local traffic, and access tariffs, which are applicable to long-distance traffic. Specifically, the Order states: "Transport and termination of local traffic are different services than access service for long-distance telecommunications," and "The Act preserves the legal distinctions between charges for transport and termination of local traffic and interstate and intrastate charges for terminating long-distance traffic." *Id.* at para. 1033. To then distinguish between local calls and long-distance calls, the Order provides that the "local service area" for wireless calls is the same as the Major Trading Area. *Id.* at paras. 1035–1036. The import is that wireless calls made within the MTA are local, and wireless calls made outside of the MTA are long-distance. *Id.* at para. 1036. The Order then concludes that "traffic to or from a CMRS network that originates and terminates within the same MTA is subject to transport and termination rates under section 251(b)(5), rather than interstate and intrastate access charges." *Id.* Because in this case all parties agree that the traffic in question originates and terminates within the same MTA, only tariffs pertaining to transport and termination rates may be imposed, and conversely, tariffs pertaining to interstate and intrastate access charges may not be imposed. Thus, the proposed tariffs, which the LECs concede are interstate and intrastate access charges, are unlawful, and the PSC was correct in disallowing them.

■ The LECs contention that the FTA does not prohibit state access tariffs in the absence of a reciprocal compensation arrangement flies in the face of the FCC's Local Competition Order, and it appears that the LECs are simply unwilling to acknowledge the clear distinction made between intraMTA calls and all other calls. They also rely on *State ex rel. Sprint Spectrum, L.P., et al. v. Missouri Public Service Comm'n*, 112 S.W.3d 20 (Mo.App. 2003), for the proposition that access tariffs are lawful even as applied to intraMTA traffic. However, the tariffs in question in *Sprint* were not access tariffs but were instead intraMTA transportation and termination tariffs—tariffs that are explicitly approved under the Local Competition Order. Finally, the LECs argue that the access tariffs are allowable under the FTA's "safe harbor" provision in sec. 251(g), which states that until reciprocal compensation agreements are entered in to, LECs are to be afforded the same state tariffs that applied to wireless traffic before the FTA was enacted. The access tariffs available to the LECs at that time, however, did not purport to cover intraMTA wireless traffic, and it was for that reason that the LECs sought to enlarge the scope of those access tariffs in the first place. The safe harbor, in other words, applies only to the existing access tariffs on long-distance calls, rather than calls placed within the MTA.

## III. Conclusion

The PSC was correct in holding that the proposed access tariffs are unlawful. Accordingly, the judgment of the circuit court is reversed, and the decision of the PSC is affirmed.

WOLFF, C.J., STITH, RUSSELL and WHITE, JJ., and ROMINES, Sp.J., concur.

PRICE, J., not participating.