Christopher and Renee YOUNG,
Appellants,

v.

**CHILDREN'S DIVISION, STATE OF
MISSOURI DEPARTMENT OF SO-
CIAL SERVICES, Respondent.**

**No. SC89190.**

Supreme Court of Missouri,
En Banc.

March 17, 2009.

As Modified on Denial of Rehearing
May 5, 2009.

John J. Ammann, St. Louis University legal Clinic, St. Louis, MO, for Appellants.

Chris Koster, Atty. Gen., Sarah E. Ledgerwood, Asst. Atty. Gen., Jefferson City, MO, for Respondent.

PATRICIA BRECKENRIDGE, Judge.

Christopher and Renee Young seek review of a decision from the children's division of the department of social services denying their request for an adoption subsidy through the behavioral foster care ("BFC") program. This Court has jurisdiction under Mo. Const. art. V sec. 10, as this case is taken on transfer after opinion by the court of appeals. Because the division's decision is not based on a promulgated rule, the decision is unauthorized by law. The circuit court judgment affirming the division's decision is reversed, and the cause is remanded to the circuit court. The circuit court is directed then to remand to the division.

### Factual and Procedural Background[1]

In February 2001, J.Y. and H.Y., foster children and biological siblings then aged 6 and 4 respectively, were placed in the Youngs' care. In March 2003, the Youngs adopted J.Y. and H.Y. The Youngs received the basic adoption subsidy from the division for both children from the date of the adoption. In December 2003, the Youngs adopted B.Y., the younger, biological brother J.Y. and H.Y. The Youngs entered into another subsidy agreement with the division in December 2003 after B.Y.'s adoption, although no changes were made to the subsidy amounts the Youngs received for J.Y. and H.Y.

In March 2004, the Youngs requested placement of J.Y. and H.Y. into the BFC program. The BFC program provides a higher monthly stipend to foster and adoptive parents of children with behavioral problems.

After the Youngs inquired into the program, Trish Sparks, an adoption specialist

with the division, mailed the Youngs a referral packet with information and forms for the Youngs to complete. Once the Youngs returned the forms, Ms. Sparks sent the information to the BFC unit workers, and "staffing" meetings were held September 14, 2004, and October 12, 2004. Following the first staff meeting, the Youngs were asked to supply some additional documentation. On January 27, 2005, the division denied the Youngs' BFC subsidy request.

On February 1, 2005, the Youngs filed an application requesting a hearing to review the denial of the BFC adoption subsidy. On April 27, 2005, the division conducted a hearing. At the hearing, Ms. Sparks testified that she discussed the BFC program with the Youngs before J.Y. and H.Y. were adopted and that the Youngs approached her about the program after B.Y.'s adoption. Ms. Sparks participated in the staffing meetings as part of the staffing team but was not familiar with the BFC program criteria. Ms. Sparks testified that Marie Clark, a consultant for the division, makes a recommendation to the team and then the team makes the final decision of whether to accept a child into the BFC program.

### J.Y.

Dr. David Lipsitz, a clinical psychologist, conducted a psychological evaluation of J.Y. in May 2004. Dr. Lipsitz diagnosed J.Y. with attention deficit hyperactivity disorder ("ADHD"), oppositional defiant disorder and impulse control disorder. Dr. Lipsitz reported J.Y. becomes upset easily, is emotionally volatile, has difficulty coping, and has an exaggerated need for attention and affection. Dr. Lipsitz reported J.Y. will act out inappropriately in

1. This Court transferred this case after an opinion by the Court of Appeals, Eastern District, authored by the Honorable Sherri B. Sullivan. Substantial portions of that opinion are used without further attribution.

an attempt to gratify his needs and, as a result, frequently comes into conflict with others.

Rhonda Kane, a therapist, evaluated J.Y. in July and October 2004. Ms. Kane's report indicated she believed J.Y. was probably dangerous to others, was severely impulsive with consistent and persistent symptoms, and needed intense supervision.

J.Y.'s school and daycare reported numerous incidents of problems with J.Y. over a three-year period. One incident occurred at J.Y.'s school, in the year preceding the staff meetings, in which J.Y. and another student were throwing rocks at each other. The school has an accommodation plan to address J.Y.'s ADHD and behavioral issues through positive reinforcement and time-outs. The incidents reported from J.Y.'s daycare in the year leading up to the staff meetings included: (1) three incidents in September 2003 of J.Y. kicking or throwing things; (2) two incidents in October 2003 where J.Y. kicked or bit another child; (3) two incidents in 2004 where J.Y. shoved or punched H.Y.; (4) being disrespectful to a teacher; (5) kicking and throwing things when asked to stop wrestling with a smaller child; and (6) slapping B.Y. in the face while wrestling.

Ms. Young testified J.Y. has asthma and takes several medications daily. J.Y.'s asthma limits his activities, which makes him angry and upset. Ms. Young stated J.Y. is very aggressive and violent to others. Ms. Young testified J.Y. cannot be reasoned with or comforted when he is angry. When angry, J.Y. throws things, punches and kicks. The Youngs cannot go out socially as a family because J.Y. throws tantrums, breaks things and hurts other people's children.

Ms. Young testified additional incidents occurred at J.Y.'s school and daycare that were not in the incident reports because the facilities do not write up every incident, particularly because J.Y.'s behaviors are everyday problems. Ms. Young stated J.Y.'s behavior is better at school than at home and daycare because his aggression comes out more while playing than during the regimented school schedule.

Mr. Young testified he adjusted his work schedule so he can pick up the children right after school because it helps eliminate many of J.Y.'s tantrums. Mr. Young stated J.Y. got into a physical fight with a neighbor boy in the fall of 2004 and recently "choke tagged" a boy three years younger. Mr. Young testified J.Y. no longer plays baseball because J.Y. argued with the coach, threw things and refused to play if he did not get his way. Mr. Young testified the children act better when they are supervised by him or Ms. Young.

### H.Y.

Dr. Lipsitz conducted a psychological evaluation on H.Y. in April 2004. Dr. Lipsitz diagnosed H.Y. with ADHD and impulse control disorder. Dr. Lipsitz found H.Y. had problems with her primary support group and in her social environment. Ms. Kane reported H.Y. was moderately impulsive, had mild emotional and conduct disturbance, and had mild oppositional behavior with consistent and persistent symptoms. Ms. Kane found H.Y. to be possibly dangerous to others.

H.Y.'s school and daycare reported numerous instances in an approximately two-year period. In the year preceding the staffing meetings, H.Y.'s school reported only one disciplinary incident in which H.Y. stole a bottle of water. The incidents reported by H.Y.'s daycare in the year preceding the staff meetings included: (1) kicking a television screen; (2) wandering away from the group while waiting for the

bus; (3) hitting another child in the head with rolled-up paper; and (4) fighting with J.Y. Ms. Young testified the daycare and school do not write up every incident, particularly because H.Y.'s behaviors are everyday problems.

Ms. Young testified H.Y. is not allowed to play with other children alone because she has acted out sexually at home, daycare and school. Ms. Young testified H.Y. is not allowed to wear dresses because she acts out sexually. Ms. Young testified there has been only one incident of H.Y. acting out sexually at home because she and Mr. Young do not let H.Y. out of their sight. Ms. Young stated H.Y. cannot be trusted without constant supervision in any setting because she gets into things and steals. Ms. Young testified H.Y. also picks at sores and has used paperclips to pierce her ears.

Ms. Young testified that since J.Y. and H.Y. were placed in their home in February 2001, some of the children's behaviors have gotten better while others have gotten worse. Ms. Young stated she has to have three babysitters watch the children at a time in case J.Y. throws a tantrum and to ensure H.Y. is being watched constantly.

Marie Clark is the director of The Behavioral Institute. Ms. Clark has a master's degree in psychology and a postgraduate certificate in mental and family therapy. Ms. Clark does not evaluate children but is a consultant who reviews the information presented at the staff meetings to determine if the children meet the criteria for the BFC program. Ms. Clark participated in the staff meetings for the Young children. Prior to the meetings, Ms. Clark reviewed the Young children's referral packets and the accompanying reports.

Ms. Clark stated that, when considering a child for the BFC program, the division

looks for behaviors beyond those that are typically seen for children in foster care and that would be disruptive to the child's foster care or adoption placement. The division looks for behaviors across all areas of the children's lives, including at school, home, daycare or wherever else the child interacts. Ms. Clark stated that the division looks "for behaviors that occur on a daily basis" and that the behaviors "need to be pretty frequent." Ms. Clark testified that while "significant behavior" usually means on a daily basis, the behaviors do not have to occur daily but instead must occur on a regular basis. Ms. Clark stated that she looks for behaviors that have occurred in the last six to 12 months and that earlier reports are too old to support a finding of a current behavioral problem.

Ms. Clark testified Dr. Lipsitz's diagnoses did not, by themselves, qualify the children for the BFC program. Instead, the division looks at the children's specific behaviors. Ms. Clark classified many of H.Y.'s issues as symptoms of ADHD and not as behavior apart from ADHD. Although more than half the children in the BFC program have ADHD, Ms. Clark testified children with ADHD who are accepted into the BFC program usually have a significant additional issue.

In addition, Ms. Clark classified some of H.Y.'s and J.Y.'s issues raised by Dr. Lipsitz as therapeutic issues. Ms. Clark characterized therapeutic issues as those that need to be modified through therapy, while behavioral issues are modified with various types of behavioral intervention. Ms. Clark found Ms. Kane's counseling reports for the children presented strictly therapeutic issues that were being addressed in therapy.

Ms. Clark also testified that Ms. Kane's reports lacked documentation supporting her assessment that J.Y. is probably dan-

gerous and is consistently and persistently symptomatic or that H.Y. is defiant in different types of settings and injurious to other people frequently.

Ms. Clark testified that the division considers the parents' reports about the children's behaviors and that the Youngs did not indicate the behaviors were occurring on a regular basis. As Ms. Clark recalled, the Youngs stated at the staff meeting that they were managing the children's problems successfully. Ms. Clark stated that the division looks for daily occurrences first and that they were not present in this case.

Ms. Clark testified some of the incidents reported by J.Y.'s school and daycare supported a finding that J.Y. had a behavioral problem, while others were not severe enough to be considered a problem. Ms. Clark considered the daycare reports but questioned whether the daycare had proper supervision because similar behavior was not occurring at school. Ms. Clark testified J.Y. was denied for the BFC program because most of the discipline incident reports for J.Y. were for minor incidents and were too old to reflect J.Y.'s present condition, the behaviors were not occurring across all settings, and the behaviors were not occurring frequently enough.

Ms. Clark considered the incident reports about H.Y. but found that many of them were not serious enough to qualify her for the BFC program. Ms. Clark also noted there was a lack of documentation that H.Y. had been acting out sexually. Ms. Clark denied H.Y.'s BFC referral due to a finding that the behaviors were not severe enough or currently occurring frequently enough and across all settings.

On November 9, 2005, the division affirmed the denial of BFC benefits. The division held that little evidence supported a finding that the children's behavioral problems were at the level of severity or occurred consistently enough to meet the BFC program criteria.

On September 11, 2006, the Youngs filed a petition in the circuit court seeking review of the division's decision. On January 16, 2007, the circuit court affirmed the division's decision, finding that although a different ruling would have been appropriate, the court was constrained to find the division's decision was supported by substantial competent evidence and was not clearly against the weight of that evidence. The Youngs subsequently filed this appeal.

## Points on Appeal

The Youngs raise five points on appeal. First, they assert that the division's denial of the Youngs' request for the BFC adoption subsidy benefits was unauthorized by law, arbitrary and unreasonable because the division is required to adopt formal rules and regulations governing whether applicants qualify for the BFC subsidy. Second, the Youngs claim that the child welfare manual provisions regarding adoption subsidies do not have the force of law because they do not constitute "rules and eligibility requirements." Third, the Youngs submit that, in making its decision, the division erroneously relied on factors unstated in any statute, regulation or in its own manual by requiring that the children's behavioral problems be severe, occur daily and occur across all settings. Fourth, the Youngs assert that the division's decision was not based on competent and substantial evidence based on the whole record, because all the evidence showed that J.Y. and H.Y. had significant behavioral problems that met or exceeded the criteria for the BFC subsidy. Finally, the Youngs claim that the division's decision was unauthorized by law and was arbitrary, capricious and unreasonable because federal and state law and the public

policy stated therein require that the adoption subsidy program be used to provide permanent homes for abused and neglected children.

## Standard of Review

■ "In an appeal following judicial review of an agency's administrative action, this Court reviews the decision of the agency, not the circuit court." *TAP Pharmaceutical Products, Inc. v. State Board of Pharmacy*, 238 S.W.3d 140, 141 (Mo. banc 2007). "Pursuant to section 536.140.2, this Court reviews to determine 'whether the agency's findings are supported by competent and substantial evidence on the record as a whole; whether the decision is arbitrary, capricious, unreasonable or involves an abuse of discretion; or whether the decision is unauthorized by law.' " *Id.* at 142 (quoting *Community Bancshares, Inc. v. Secretary of State*, 43 S.W.3d 821, 823 (Mo. banc 2001)).

## Discussion

■ In their first point, the Youngs assert that the division's denial of their request for the BFC rate of adoption subsidy benefits was unauthorized by law, arbitrary and unreasonable because the division is required by this Court's opinion in *Department of Social Services v. Little Hills Healthcare, L.L.C.*, 236 S.W.3d 637 (Mo. banc 2007), and section 453.074, RSMo 2000,[2] to adopt formal rules and regulations governing applicants' qualification for the BFC subsidy.

In *Little Hills*, this Court addressed whether the division of medical devices ("DMS") was required to promulgate a rule for the method it uses to annually calculate the "estimated Medicaid days" of Medicaid service providers. 236 S.W.3d at 639. Section 208.153.1, provided that

DMS "shall by rule and regulation define the reasonable costs, manner, extent, quantity, quality, charges and fees" for medical assistance services. *Little Hills*, 236 S.W.3d at 639 n. 3. DMS had no regulations setting forth the precise method for calculating the "estimated Medicaid days." *Id.* at 639. DMS considered three general components, but had no regulations for calculating each of the components. *Id.* at 639–40. This led to inconsistent "estimated Medicaid days" for Medicaid service providers from year to year. *Id.* at 640.

This Court found that "[w]hether an agency decision should be promulgated as a rule is a determination that is guided by section 536.010(6), RSMo Supp.2006." *Id.* at 641. That section states, in relevant part:

"**Rule**" means each agency statement of *general applicability* that implements, interprets, or prescribes law or policy, or that describes the organization, procedure, or practice requirements of any agency. The term includes the amendment or repeal of an existing rule, but does not include:

(a) A statement concerning only the internal management of an agency and which does not substantially affect the legal rights of, or procedures available to, the public or any segment thereof;

(b) A declaratory ruling issued pursuant to section 536.050, or an interpretation issued by an agency with respect to a specific set of facts and intended to apply on to that specific set of facts;

(c) An intergovernmental, interagency, or intraagency memorandum, directive, manual or other communication which does not substantially af-

---

**2.** All statutory references are to RSMo 2000 unless otherwise noted.

fect the legal rights of, or procedures available to, the public or any segment thereof;

Section 536.010(6) (emphasis added).

Among its arguments that the "estimated Medicaid days" calculation does not fall under rulemaking, DMS asserted that the calculations were not generally applicable because they "related to specific facts for specific providers." *Little Hills*, 236 S.W.3d at 642. This Court disagreed and found that because, in each year, DMS applies one method for calculating "estimated Medicaid days" for all Medicaid service providers, the standard used to make the decision was a standard of "general applicability" for rulemaking purposes. *Id.*

This Court also addressed the effect of DMS's failure to promulgate a rule. *Id.* at 643. "[A] failure to promulgate a rule as required voids the decision that should have been properly promulgated as a rule." *Id.* (citing *NME Hospitals, Inc. v. DMS*, 850 S.W.2d 71, 74–75 (Mo. banc 1993)). DMS's "estimated Medicaid days" decision, then, was invalid because it was based on criteria or methodology that should have been promulgated as a rule. *Id.* at 643–44.

The division here attempts to distinguish this case from *Little Hills* on two grounds. First, the division argues that section 453.074 is not similar to section 208.153.1. Section 453.074.1 states the division, in administering the subsidy program, "shall ... (2) Provide all petitioners for adoption with the *rules and eligibility requirements* for subsidies[.]" (Emphasis added). Section 208.153.1, on the other hand, provided

that DMS "shall by *rule and regulation* define the reasonable costs, manner, extent, quantity, quality, charges and fees" for medical assistance services. (Emphasis added). Because section 453.074.1 just states that rules and eligibility requirements shall be provided, instead of stating that the eligibility requirements shall be defined by rule and regulation, the division argues that the Court's reasoning in *Little Hills* does not apply.

Contrary to the division's suggestion, the holding in *Little Hills* was not dependent on the statutory language of section 208.153.1.[3] As stated in *Little Hills*, section 536.010(6), defining an administrative "rule," guides the determination of whether the agency policy should be promulgated as a rule. 236 S.W.3d at 641–42.

In its brief, the division also attempts to distinguish this case from *Little Hills* on the basis that, unlike the methodology used to calculate "estimated Medicaid days," the criteria used to decide whether a child is eligible for BFC subsidy cannot be applied in a uniform fashion because it "requires that the division consider the specific needs and behavioral issues of each child on a case-by-case basis." As such, the division argues, the criteria for those decisions are not generally applicable and, therefore, are not subject to rulemaking.

The division is correct that the decision of whether a child is eligible for BFC subsidy is an individualized determination relating to the specific facts and circumstances of that particular child.[4] But that is not the decision that must be promulgat-

---

**3.** Even if *Little Hills* had relied on section 208.153.1, the division fails to explain persuasively why the differing language between the statutes requires rulemaking in one and not the other.

**4.** As section 453.073, RSMo 2000, states, the division decides the monetary amount of a subsidy to an adopted child with "reference to the needs of the child, including consideration of the physical and mental condition, and age of the child in each case. . . ."

ed as a rule. Here, as in *Little Hills*, at issue is the validity of an individualized decision that is based on a set of standards that has not been promulgated as a rule. In both these cases, it is the agency's policy of what criteria and methodology apply in making individualized determinations that must be promulgated as rules, because that policy is generally applicable. Here, the BFC subsidy application procedure, the required standard of proof, the type of evidence required, what behaviors qualify, how frequent and recent the behaviors must be, and whether professional treatment is required are all examples of eligibility requirements that are generally applicable to all children.

The division also asserts that it "uses the [Child Welfare] Manual, for itself and parents, to implement the adoption subsidy program." The manual sets forth a list of characteristics a BFC program candidate may exhibit. Child Welfare Manual, section 4, chapter 14, 5–7. This list includes: (1) behaviors that, if not modified, could result in the youth being designated as a status offender; (2) a history of irresponsible or inappropriate sexual behavior that has resulted in the need for extraordinary supervision; (3) threatening, intimidating or destructive behavior that is demonstrated by multiple incidents over a period of time; (4) problems of defiance when dealing with authority figures; (5) significant problems with peer relations; (6) significant problems at school that affect academic achievement or social adjustment; (7) significant problems with lying, stealing or manipulating; (8) significant problems with temper control; (9) mild substance abuse-related problems; (10) oppositional behavior that contributes to placement disruptions and

an inability to function productively with peers, parent figures and/or birth family; (11) any of the above behaviors, coupled with medical problems; or (12) any of the above behaviors displayed by one or more children of a sibling group, qualifying the entire sibling group for placement together, if appropriate. *Id.* The manual, however, has not been promulgated as a rule under the Missouri Administrative Procedure Act ("MAPA") rulemaking procedures. Further, while the division claims that it uses the child welfare manual in deciding who qualifies for BFC subsidy, it denies that the child welfare manual contains the BFC subsidy eligibility requirements.

■ "Any agency announcement of policy or interpretation of law that has future effect and acts on unnamed and unspecified facts is a 'rule.'" *Little Hills*, 236 S.W.3d at 642 (citing *NME Hospitals*, 850 S.W.2d at 74). The criteria and methodology the division uses in determining a child's qualification for BFC subsidy under section 453.073 meets the definition of "rule" under section 536.010(6) as an "agency statement of general applicability that implements, interprets, or prescribes law or policy, or that describes the organization, procedure, or practice requirements of any agency." As such, the division's eligibility requirements must be promulgated under rulemaking procedures,[5] or else they are void. *Id.* at 643.

■ What is the effect of the division's failure to promulgate a rule on the division's determination that the Youngs were not entitled to the BFC subsidy? Again, *Little Hills* is instructive. In *Little Hills*, not only did the agency's failure to promulgate a rule void the agency's policy that

---

5. "The purpose of the notice and comment procedures is to provide information to the agency through statements of those in support of or in opposition to the proposed rule." *NME Hospitals,* 850 S.W.2d at 74.

should have been properly promulgated as a rule, but it also invalidated the agency's determination of the hospital's benefits that was based on the void rule. *Little Hills*, 236 S.W.3d at 643–44. Similarly, here, the division denied the Youngs' petitions for BFC subsidy based on standards and procedure that should have been promulgated as a rule; therefore, the division's denial is void.

The Youngs further ask this Court to remand this case with directions to find that the Youngs are eligible for the BFC program. In this regard, section 453.073, is not helpful. It states that the monetary amount of a subsidy to an adopted child is determined with "reference to the needs of the child, including consideration of the physical and mental condition, and age of the child in each case...." *Id.* The correct monetary amount can be determined only after the necessary rules to make a BFC subsidy eligibility determination have been promulgated.

This Court is cognizant that the Youngs first applied for the BFC subsidy five years ago and seek a long-awaited conclusion to this matter. The division should proceed expeditiously with adoption of the necessary rules and a determination of the Youngs' application for the BFC subsidy. If the division decides that the Youngs are entitled to the BFC subsidy, the subsidies should be awarded retroactively as allowed by law. *See J.P. v. Department of Social Services*, 752 S.W.2d 847, 851 (Mo.App. 1988).

The circuit court judgment affirming the division's decision to deny the Youngs' application for BFC subsidy is reversed, and the case is remanded. The circuit court shall remand the matter to the division so that the division expeditiously can determine the Youngs' application.

Stith, C.J., Price, Teitelman and Russell, JJ., and Hardwick and McGraw, Sp.JJ, concur.

Wolff and Fischer, JJ., not participating.