STATE of Missouri, ex rel BPS
TELEPHONE COMPANY,
et al.; Respondents,

USCOC of Greater Missouri, LLC
d/b/a U.S. Cellular, Appellant,

v.

MISSOURI PUBLIC SERVICE
COMMISSION, Respondent.

No. WD 69976.

Missouri Court of Appeals,
Western District.

May 26, 2009.

---

Karl Zobrist and Roger W. Steiner, Kansas City, MO, for Appellant.

William R. England, III and Brian T. McCartney, Jefferson City, MO, for Respondent Telephone Companies.

William K. Haas, Jefferson City, MO, for Respondent Public Service Comm.

Before: THOMAS H. NEWTON, C.J., JAMES M. SMART, JR., and VICTOR C. HOWARD, JJ.

THOMAS H. NEWTON, Chief Judge.

USCOC of Greater Missouri, LLC d/b/a U.S. Cellular (U.S. Cellular) appeals the judgment of the circuit court affirming the Report and Order of the Public Service Commission (Commission). U.S. Cellular contests the Commission's imposition of a baseline investment requirement as a condition of the company's designation of eligibility for federal universal service support. We affirm.

## Regulatory Framework

In the Federal Telecommunications Act of 1996(FTA), Congress sought to promote competition in telecommunications, reduce regulation, and encourage the development of new technologies. *State ex rel. Coffman v. Pub. Serv. Comm'n,* 154 S.W.3d 316, 318 (Mo.App. W.D.2004). "Simply put, the Act was intended to deregulate the telecommunications industry, open local and long distance telecommunications markets to competition, and ensure universal telephone service for all citizens at affordable rates." *Voicestream GSM I Operating Co., LLC v. La. Pub. Serv. Comm'n,* 943 So.2d 349, 354 (La.2006). This latter goal was codified as a commitment to "universal service": the provision of affordable, quality telecommunications services for all Americans, including local telephone service and access to emergency, directory-assistance, and long-distance services. *Qwest Corp. v. F.C.C.,* 258 F.3d 1191, 1196 (10th Cir.2001).

A telecommunication carrier's cost in providing these services can vary widely. "[I]t is generally more expensive for a telephone company to provide service in a rural area, where customers are dispersed, than it is to provide the same service in an urban area, where customers are more concentrated." *Id.* at 1195. Consequently, Congress directed states and the Federal Communications Commission (FCC) to "devise methods to ensure that consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas ... have access to telecommunications and information services ... at rates that are reasonably comparable to rates charged for similar services in urban areas." *In re Fed.–State Joint Bd. on Universal Ser.,* CC Docket No. 96–45, Report & Order, 12 F.C.C.R. 8776, 8780 (1997) (affirmed in part, reversed in part, and remanded in part by *Texas Office of Public Utility Counsel v. F.C.C.,* 183 F.3d 393 (5th Cir. 1999)).

The FTA supports the provision of universal service in high-cost areas by requiring interstate telecommunications carriers to contribute to a federal Universal Service Fund (USF). *WWC Holding Co. v. Sopkin,* 488 F.3d 1262, 1267 (10th Cir.

2007); 47 U.S.C. §§ 254(d) & (e). In turn, carriers designated as "Eligible Telecommunications Carriers" (ETC) receive universal service funds (high-cost support) as public subsidies for providing universal services in specified areas. *Sopkin*, 488 F.3d at 1267; 47 U.S.C. § 214(e).

When a carrier seeks ETC status for an area within a state, the state public utility commission is responsible for the ETC designation. *Sopkin*, 488 F.3d at 1267; 47 U.S.C. § 214. In order to be eligible, the carrier is required to offer universal service support services throughout the designated area and to advertise the services and charges. 47 U.S.C. § 214(e). The FTA further mandates that universal service support is to be used only "for the provision, maintenance, and upgrading of facilities and services for which the support is intended" and under FCC Rules, states are required to annually re-certify this use of the funds. 47 U.S.C. § 254(e); 47 C.F.R. § 54.314 (2008). In other words, "[t]he state must certify that a carrier is using the funding appropriately." *Qwest Corp.*, 258 F.3d at 1198.

In Missouri, the ETC designation is performed by the Commission.[1] Under state regulation, an applicant for federal ETC designation is required to show:

1. Intended use of the high-cost support, including detailed descriptions of any construction plans with start and end dates, populations affected by construction plans, existing tower site locations for CMRS [Commercial Mobile Radio Service] cell towers, and estimated budget amounts;

2. A two (2)–year plan demonstrating, with specificity, that high-cost universal service support shall only be used for the provision, maintenance and upgrading of facilities and services for which the support is intended in the Missouri service area in which ETC designation was granted.

. . . .

3. The two (2)–year plan shall include a demonstration that universal service support shall be used to improve coverage, service quality or capacity on a wire center-by-wire center basis throughout the Missouri service area for which the requesting carrier seeks ETC designation including:

A. A detailed map of coverage area before and after improvements and in the case of CMRS providers, a map identifying existing tower site locations for CMRS cell towers;

B. The specific geographic areas where improvements will be made;

C. The projected start date and completion date for each improvement;

D. The estimated amount of investment for each project that is funded by high-cost support;

E. The estimated population that will be served as a result of the improvements;

F. If an applicant believes that service improvements in a particular wire center are not needed, it must explain its basis for this determination and demonstrate how funding will otherwise be used to further the provision of supported services in that area; and

G. A statement as to how the proposed plans would not otherwise occur absent the receipt of high-cost support and that such support will be used in

---

1. Missouri also has its own state universal service fund, which is not at issue here. *See* section 392.248 (establishing a state universal service fund and administering board). Stat-utory references are to RSMo 2000 and the Cumulative Supplement 2008 unless otherwise indicated.

addition to any expenses the ETC would normally incur;

. . . .

5. A demonstration that the commission's grant of the applicant's request for ETC designation would be consistent with the public interest, convenience and necessity;

4 CSR 240–3.570(2).

## Factual and Procedural Background

U.S. Cellular provides commercial mobile radio services in Missouri (wireless cell phone service). In April of 2005, the company applied to the Commission for designation as an ETC in order to receive federal high-cost support. In its application, U.S. Cellular committed to using the support in areas where it would not otherwise invest. The company stated that there were many areas it "would like to provide services but cannot without support." It further explained that it would use high-cost support to construct facilities where "no business plan supports construction of new facilities." Attached to its application was a list of sixteen locations where the company intended "to construct facilities within the first eighteen months of receiving high-cost support."

Applications to intervene were granted to several telecommunications exchange companies operating in Missouri (wireline companies). In October of 2005, the Commission held a hearing on U.S. Cellular's application. At the hearing, U.S. Cellular explained that it would use high-cost support to construct new cell sites in areas where it would not otherwise build them. The company also stated that it did not compile or maintain state-specific budgets for capital expenditures.

The Commission found that the company had "submitted only a rather vague 18–month plan calling for the building of sixteen new cell towers" and had thus not provided sufficient evidence of how it would use high-cost support to improve its network. Rather than reject the application, the Commission issued an order allowing U.S. Cellular to submit additional evidence and suggested the company be guided in its submission by an impending regulation (now in effect) which would require a detailed two-year plan.[2] The Commission also explained that it would expect U.S. Cellular's "budgeted expenditures to match expected revenues from the high-cost support fund." In August of 2006, the company presented a compliance filing with a two-year network improvement plan setting forth "the company's plans to spend its high-cost support on significant improvements in network coverage and capacity in rural areas, *inter alia*, through the construction of 39 new cell sites." The plan projected an expectation of $11 million in high-cost support per year.

In December of 2006, the Commission held a second hearing on U.S. Cellular's application. At the hearing, it was adduced that four of the sixteen cell towers U.S. Cellular had previously stated could not be built without high-cost support had already been constructed. Mr. Nick Wright, U.S. Cellular's Vice President of West Operations, testified on cross to U.S. Cellular's expenditures in Missouri in 2006.

Q: . . . Would you agree that every year U.S. Cellular would spend a certain amount for construction of new facilities, new towers, or at least a certain amount for capacity additions to existing facilities regardless of the receipt of high cost support?

A: That's correct.

Q: You wouldn't have an estimate on what that might be, though?

**2.** The new rule came into effect prior to U.S. Cellular's compliance filing.

A: Our current expenditures?

Q: Yeah. I mean—

A: For—for 2006, the current year, we spent approximately 16—$17 million in Missouri. Okay. Minus the St. Louis markets. So in the high cost areas, $16 million, approximately, year 2006.

Testimony was also adduced from Mr. Wright that at the time of the 2005 hearing, U.S. Cellular had been operating in Missouri for sixteen years and had spent approximately $160 million in its rural markets in the state, thus investing, on average, approximately $10 million per year in rural infrastructure without high-cost support. Mr. Alan Johnson, Regional Director of Engineering for U.S. Cellular, testified *in camera* about the company's average expenditures in its rural Missouri markets between 2003 and 2006 and its expected budgets for 2007 and 2008. Mr. Wright later confirmed Mr. Johnson's estimates in open proceedings.

In May of 2007, the Commission issued an order designating U.S. Cellular as an ETC. However, the Commission found U.S. Cellular's application problematic; the company already built cell sites in both urban and rural areas of Missouri and the company was "unable to draw a clear distinction between cell sites that can be built without support and those that can be built only with such support." The Commission found "it would not be in the public interest to allow U.S. Cellular to spend USF funds, rather than its own funds, while not increasing the number of sites that it will construct. Such a result would simply enrich U.S. Cellular's shareholders without any benefit to its Missouri customers." The Commission further explained that based on U.S. Cellular's submission, it would be difficult for the agency to evalu-

ate whether the company was spending high-cost support appropriately or "simply pocketing the money...." The Commission found that a solution "would be to establish an investment base line." While acknowledging that U.S. Cellular's capital budget varied, the Commission conditioned U.S. Cellular's ETC designation on the company "meeting a base line investment requirement of a two-year average of $15 million per year in capital expenditures for construction of cell sites in its Missouri market, excluding St. Louis and Joplin."

U.S. Cellular applied for rehearing and the Commission denied U.S. Cellular's request. U.S. Cellular subsequently filed a petition for writ of review in circuit court.[3] The circuit court affirmed the Commission's decision and U.S. Cellular appeals.

### Standard of Review

We review the decision of the Commission, not the judgment of the circuit court. *State ex rel. GTE N., Inc. v. Mo. Pub. Serv. Comm'n*, 835 S.W.2d 356, 361 (Mo.App. W.D.1992). Our review is to determine whether the Commission's order is lawful and reasonable. *State ex rel. Associated Natural Gas Co. v. Pub. Serv. Comm'n*, 37 S.W.3d 287, 292 (Mo.App. W.D.2000). An order is lawful if the Commission had the statutory authority to act as it did; we review this issue *de novo*. *Coffman*, 154 S.W.3d at 320. Whether an order is reasonable "depends on whether it was supported by competent and substantial evidence upon the whole record; whether it was arbitrary, capricious, or unreasonable; or whether the [Commission] abused its discretion." *Associated Natural Gas Co.*, 37 S.W.3d at 292. The party seeking to set aside the Commis-

---

**3.** A group of Missouri wireline companies, The Small Telephone Group, also filed a petition for writ of review. The two actions were consolidated. The Small Telephone Group was also granted leave to intervene in this appeal.

sion's order has the burden to prove by clear and satisfactory evidence that the order was unlawful or unreasonable. § 386.430.

## Legal Analysis

In its first three points on appeal, U.S. Cellular disputes the legality of the Commission's baseline investment requirement. In its fourth and final point, the company contests the evidentiary basis for the requirement.

### The baseline investment requirement is not rulemaking

U.S. Cellular first asserts that the Commission's baseline investment requirement must be either generally applicable to ETC applicants or, conversely, imposed only on U.S. Cellular. If the requirement is generally applicable, the company argues, then the requirement is a new rule— or the amendment of an existing rule— and, as such, is invalid because it was not adopted according to rule-making procedures. *See* § 536.021.7; *Young v. Children's Div., State Dep't. of Soc. Servs.*, 284 S.W.3d 553, 558, 2009 WL 1211314, at *6 (Mo. banc May 5, 2009) (a rule not adopted according to procedure is void). The Commission responds that the baseline investment requirement is not a rule. Rather, it is a condition based on specific facts and, as such, was validly imposed under the Commission's authority. *See* 47 U.S.C. § 214(e)(2) (authorizing state commissions to make the ETC designation); 4 CSR 240–3.570 (stating Missouri's requirements for the ETC application).

■ "Rule" is defined within Missouri's Administrative Procedures Act as an "agency statement of general applicability that implements, interprets, or prescribes law or policy[.]" § 536.010(6). "Any agency announcement of policy or interpretation of law that has future effect and acts

on unnamed and unspecified facts is a 'rule.'" *Dep't of Soc. Servs., Div. of Med. Servs. v. Little Hills Healthcare, L.L.C.*, 236 S.W.3d 637, 642 (Mo. banc 2007). The application of a set of standards for awarding a subsidy may be rulemaking. *Young*, 284 S.W.3d 553, 559–60, 2009 WL 1211314, at *7. In *Young*, the Department of Social Services applied a set of standards to determine whether a family was eligible for an adoption subsidy under the behavioral foster care program. *Id.* 559–61, at *7–8. Because the criteria were employed as agency policy made generally applicable to those seeking the subsidy, the agency's decision was invalid without the standards being promulgated by a rule. *Id.*

■ In the case at bar, the Commission's decision was not a statement of "general applicability"; the condition was imposed only on U.S. Cellular. The decision also did not act on "unnamed and unspecified facts"; it acted on the facts before the Commission as a result of U.S. Cellular's application. Nor did the Commission implement unpromulgated generally applicable standards. Rather, the Commission applied existing statutes and rules to the submission made by U.S. Cellular. Federal law requires the Commission to make the ETC designation in compliance with universal service goals. *See* 47 U.S.C. § 214. Federal law also requires a carrier that receives USF support to "use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended." 47 U.S.C. § 254(e). State regulations require the ETC applicant to provide a two-year detailed plan that includes "[t]he estimated amount of investment for each project that is funded by high-cost support." 4 CSR 240–3.570(2)(A)(3)(D). Further, the applicant is required to provide "[a] statement as to how the proposed plans would not otherwise occur absent the

receipt of high-cost support and that such support will be used *in addition to* any expenses the ETC would normally incur." 4 CSR 240–3.570(2)(A)(3)(G) (emphasis added).

The Commission rejected U.S. Cellular's first application because it found the company failed to demonstrate that it would use high-cost support to improve its network and thus advance universal service. The Commission found U.S. Cellular's second offering similarly deficient in that the company failed to provide "a clear distinction between cell cites that can be built without support and those that can be built only with such support." In order to solve this particular problem "of ensuring that U.S. Cellular spends USF funding in addition to, rather than instead of its own investment money," the Commission ordered that U.S. Cellular's ETC designation be conditioned on the company meeting a baseline investment requirement. The Commission's act was thus designed to bring U.S. Cellular's application into compliance with the federal and state requirements for the ETC designation.[4]

 Consequently, the record reflects that the condition was imposed after the Commission's specific finding that U.S. Cellular was unable to provide sufficient evidence of how the Company would use high-cost support to advance universal service, rather than to replace its own invest-ments. The record does not show that the Commission intends or will employ such condition as a generally applicable rule. State commissions are "not required to engage in a rule-making proceeding when imposing conditions pursuant to making an ETC designation." *Sopkin*, 488 F.3d at 1278. Here, the Commission imposed a condition; it did not create a generally applicable rule. Consequently, its act was not invalid rulemaking, and U.S. Cellular's first point is denied.

### The condition is "competitively neutral" under 47 U.S.C. section 253(b)

47 U.S.C. section 253 was enacted to "ensure that state and/or local authorities cannot frustrate the [FTA's] explicit goal of opening all markets to competition."[5] Section 253(b) permits states to impose requirements to, *inter alia*, "preserve and advance universal service," provided they do so on a "competitively neutral basis."[6] In its second point, U.S. Cellular contends that because it is the only telecommunications provider in Missouri required to meet a baseline investment condition, the condition is not "competitively neutral."

 The goal of competitive neutrality under the federal statute is to ensure that "no entity receives an unfair competitive advantage that may skew the marketplace or inhibit competition." *In re Fed.– State Joint Bd. on Universal Serv.*, 12

---

4. U.S. Cellular's brief argues that the Commission recognized "that U.S. Cellular complied with all aspects of the ETC rule." While the order does state that U.S. Cellular was in compliance, we read the order as finding U.S. Cellular in compliance *because of* the Commission's imposition of the condition.

5. *In re the Petition of the State of Minnesota for a Declaratory Ruling Regarding the Effect of Section 253 on an Agreement to Install Fiber Optic Wholesale Transport Capacity in State Freeway Rights–of–Way*, CC Docket No. 98–1,

Memorandum Opinion and Order, 14 F.C.C.R. 21697, 21703 (1999).

6. The section provides:

Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this title, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

F.C.C.R. at 8802.[7] The FCC has interpreted "competitive neutrality" under this section to mean that "universal service support mechanisms and rules neither unfairly advantage nor disadvantage one provider over another, and neither unfairly favor nor disfavor one technology over another." *Id.* at 8801. "[T]he proper inquiry is whether the *effect* of the legal requirement, rather than the method imposed, is competitively neutral." *In re Fed.–State Joint Bd. on Universal Serv.,* CC Docket No. 96–45, Declaratory Ruling, 15 F.C.C.R. 15168, 15177 (2000) (emphasis added). Thus, applying regulations differently to different carriers is not necessarily a discriminatory act. *XO Mo., Inc. v. City of Maryland Heights,* 256 F.Supp.2d 966, 975–76 (E.D.Mo.2002). Rather, the inquiry requires looking to the specific provisions and facts at hand. *See id.*

■■■ While U.S. Cellular contends that the baseline investment condition is unlawful because it is not competitively neutral, we find its argument unconvincing. In order for any carrier to receive ETC designation, it is required to meet the criteria discussed above, including providing "[a] statement *as to how* the proposed plans would not otherwise occur absent the receipt of high-cost support and that such support will be used in *addition to any expenses the ETC would normally incur.*" 4 CSR 240–3.570(2)(A)(3)(G) (emphasis added). We do not believe the regulation contemplates, as U.S. Cellular argues, that an ETC must simply "promise" to use the funds lawfully. Rather, the regulation specifically requires the ETC applicant to put forth "a statement as to how" USF funds will enable projects that would not

otherwise occur—in addition to requiring detailed maps showing coverage before and after improvements, specific geographic areas, start and end dates, and the amount of each project funded with high-cost support. 4 CSR 240–3.570(2)(A). U.S. Cellular was unable to make this showing to the Commission's satisfaction.

The record reflects that the Commission imposed the baseline investment condition because U.S. Cellular was otherwise unqualified for the ETC designation: the company did not show high-cost support would be used to expand universal service rather than replace its own spending. The Commission's action was competitively neutral in its effect: requiring U.S. Cellular to meet the prerequisites for ETC designation as a condition of granting the ETC designation. Under these facts, were the Commission to designate U.S. Cellular as an ETC *without* the baseline requirement, such an action would give U.S. Cellular an unfair advantage by allowing it to receive high-cost support without meeting the statutory and regulatory requirements, and would thus discriminate against other telecommunications carriers. U.S. Cellular's second point, therefore, is denied.

*The condition is not "rate or entry regulation" under 47 U.S.C. section 332*

47 U.S.C. section 332 was enacted prior to the FTA. Congress was concerned with creating uniform rules to ensure that "all carriers providing [equivalent services] are treated as common carriers under the Communications Act of 1934."[8] The section grants the FCC "exclusive jurisdiction to regulate the rates and conditions

---

7. Because the FCC is charged with implementing and enforcing the FTA, its regulations and decisions are binding on the industry and state commissions. *State ex rel. Alma*

*Tel. Co. v. Pub. Serv. Comm'n,* 183 S.W.3d 575, 577 (Mo. banc 2006).

8. H.R. Rep. No. 103–111, 259 (1993); *as reprinted in* 1993 U.S.C.C.A.N. 378, 586.

of market entry of mobile services." *Sopkin,* 488 F.3d at 1271. However, states are given a safe harbor to regulate "other terms and conditions" for CMRS providers.[9] *See id.* Consequently, "the jurisdictional delineation between state and federal authority focuses on the types of requirements being imposed[.]" *Id.* at 1272.

U.S. Cellular argues that the effect of the baseline investment condition is rate regulation and the condition is therefore inconsistent with, and preempted by, federal law. The company recognizes that "states have latitude to impose eligibility requirements on applicants for ETC status." However, it argues that states "are specifically prohibited from imposing universal service requirements that would amount to rate or entry regulation in violation of Section 332(c)(3)." Relying on *American Telephone & Telegraph Co. v. Central Office Telephone, Inc.,* 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998), and *Bastien v. AT&T Wireless Services, Inc.,* 205 F.3d 983 (7th Cir.2000),[10] the company argues that the baseline requirement is regulation of the quantity of its services offered within the state and is thus rate regulation reserved for the FCC. It contends that "[a]ny requirement mandating ... an amount of money to be invested in new tower construction ... is undoubtedly rate and entry regulation." We disagree.

■ First, as discussed, the baseline investment requirement is not a regulation; it is a condition the Commission imposed on U.S. Cellular to bring its application into conformity with the statutory and regulatory requirements for the status the company sought—and valued at approximately $11 million per year. Moreover, U.S. Cellular may freely avoid the requirement by declining USF funds. Consequently, we do not agree that the Commission's order imposing a condition on eligibility for the subsidy is "rate and entry" regulation.

■ Second, even assuming *arguendo* that imposing a condition came within the statute's meaning of "regulate," we do not believe that Congress intended to preempt a state commission's ability to impose conditions for the ETC designation. We read statutes relating to the same subject matter *in pari materia,* meaning that we interpret and apply them with reference to each other. *Allright Props., Inc. v. Tax Increment Fin. Comm'n of Kansas City,* 240 S.W.3d 777, 779 (Mo.App. W.D.2007). Section 332(c)(3) "draws the line between regulation of [mobile carriers'] rates or market entry, which is the FCC's exclusive purview, and 'other terms and conditions' which are permissive regulatory subjects for states." *Sopkin,* 488 F.3d at 1272. After this section was enacted, Congress gave state commissions express responsibility to designate ETC's for intrastate areas, while at the same time expressly requiring that universal service funds be used only for "the provision, maintenance, and upgrading of facilities and services for which the support is intended." 47 U.S.C. § 254(e). Congress also required state commissions to make specific findings for the designation. *Id.* § 214(e). The FCC itself has "generally affirmed that states have the discretion to impose additional eligibility requirements

**9.** The section provides that "no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services."

**10.** Both cases involved federal preemption of state law claims.

on carriers seeking ETC designations[.]" *Sopkin*, 488 F.3d at 1272. Consequently, given Congress' subsequent express and specific delegation of responsibility to state commissions to ensure that the ETC eligibility requirements are met, we do not find the Commission's act unlawful under section 332. *See similarly Mountain Solutions, Inc. v. State Corp. Comm'n*, 966 F.Supp. 1043, 1049 (D.Kan.1997) (finding that Kansas law requiring mobile carriers to contribute to Kansas Universal Service Fund was not preempted by 47 U.S.C. section 332). U.S. Cellular's third point is denied.

### *The Commission's Order was supported by competent and substantial evidence*

■ In its fourth point on appeal, U.S. Cellular argues that there was insufficient evidence to support either that the condition was needed or its amount. The company first argues that the Commission's decision to require the baseline was caused by U.S. Cellular's construction of the four cell sites that it had represented in the first hearing could not be built without high-cost support and that for the Commission to make its decision on this basis was arbitrary. The company further asserts that the baseline investment condition is unnecessary because if it did not use high-cost support appropriately, the Commission could refuse to certify it in the annual certification process "and therefore stop the flow of USF funds."

The record, however, does not show that the Commission's order was based on U.S. Cellular's construction of the four cell sites. Rather, the Commission's order specifically states that U.S. Cellular's construction of these sites, however valid its reasons, was an *illustration* of the underlying problem in U.S. Cellular's application: the Commission had no means to determine "whether a particular cell site would have been built anyway, even without USF support." The record also demonstrates that the Commission found that the annual re-certification process was an insufficient means for verifying proper expenditure of the high-cost support because, even if U.S. Cellular used USF funds to expand its network in rural areas, it was already doing so under its competitive business model, and the Commission therefore could not verify that the funds were doing more than simply replacing U.S. Cellular's own spending. In other words: the re-certification process would present the same problems as U.S. Cellular's application. The record also reflects the Commission's concern that a later de-certification does not provide for recovery of misspent funds.

Second, U.S. Cellular argues that the amount of the baseline investment condition is not supported by competent and substantial evidence in the record because its past expenditures in its rural Missouri markets have varied widely, and because the Commission failed to make specific findings regarding contrary testimony.

■ "In reviewing the [agency's] decision, we must ascertain whether [it] could reasonably have made its findings and reached its decision on the basis of all the evidence before it." *Knapp v. Mo. Local Gov't Employees Ret. Sys.*, 738 S.W.2d 903, 912 (Mo.App. W.D.1987). The Commission's evidentiary findings are given a presumption of validity. *Envtl. Utils., LLC v. Pub. Ser. Comm'n*, 219 S.W.3d 256, 263 (Mo.App. W.D.2007). Thus, we presume its decisions on factual issues are correct until the contrary is shown. *Coffman*, 154 S.W.3d at 320.

U.S. Cellular testified that (1) from 1989 to 2005, the company spent $160 million, thus an average of $10 million per year, and (2) the company had recently been

spending approximately $16 million per year in high-cost areas. The company further testified *in camera* as to its budget for new infrastructure in rural Missouri in 2007 and 2008 and confirmed the testimony in open proceedings. Consequently, we find the record provides sufficient support for the Commission's conclusion.

U.S. Cellular also contends that the Commission's condition is unsupported because testimony did not support that the company had invested, on average, $15 million annually in "new cell site construction." The record shows that Mr. Wright testified to expenditures for the "construction of new facilities, new towers, or at least a certain amount for capacity additions to existing facilities." In his direct testimony, Mr. Wright specified that the company had invested $160 million to "construct cell sites and to tie the system together with T-1, microwave, switching, and trunking facilities." Mr. Johnson's *in camera* testimony reflects similar information. At oral argument the Commission explained that the "new cell site construction" condition in its order included cell towers and land, as well as microwave towers, cabling to connect the network, and more—not just the construction of the cell towers themselves. Consequently, under our standard of review, we find the record provides adequate support for the Commission's conclusions.

Finally, U.S. Cellular contends that the Commission was required to make specific findings rejecting the company's testimony that past expenditures do not predict future expenditures in the wireless industry. U.S. Cellular argues that the Commission "must make a specific finding that undisputed or unimpeached evidence is incredible and unworthy or belief before it may disregard such evidence." *See Knapp,* 738 S.W.2d at 913 (agency could not ignore competent evidence where "[n]o

evidence was offered that in any way challenged" it). U.S. Cellular, however, ignores that its witnesses also testified to the company's expected expenditures for the upcoming two years. Consequently, the "evidence" U.S. Cellular points to as showing the impracticability of predicting future expenditures was disputed. When there is conflicting evidence, the Commission is free to adopt or reject a witness's testimony. *Associated Natural Gas Co.,* 37 S.W.3d at 294.

## Conclusion

After a thorough review of the record and considering the parties arguments, we conclude that the Commission's order was lawful and reasonable. We affirm.

SMART and HOWARD, JJ. concur.