Angelique DEGRAFFENREID, et al., Appellants–Respondents,

v.

STATE BOARD OF MEDIATION, et al., Respondents–Appellants,

Missouri Home Care Union, Respondent–Appellant.

Nos. WD 73330, WD 73331, WD 73332.

Missouri Court of Appeals, Western District.

May 1, 2012.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 29, 2012.

Application for Transfer Denied Oct. 30, 2012.

---

**2.** There is no allegation Beard was denied benefits as an employee.

Lowell D. Pearson and Harvey M. Tettlebaum, Jefferson City, MO, for appellant-respondents.

James Layton and William Sherman Vanderpool, III, Jefferson City, MO, and Arthur J. Martin, St. Louis, MO, for respondent-appellants.

Division Three: JAMES E. WELSH, P.J., JAMES M. SMART, JR., and JOSEPH M. ELLIS, JJ.

JAMES M. SMART, JR., Judge.

This case involves a challenge to a union election conducted by the State Board of Mediation to decide whether home care workers participating in the Consumer-Directed Personal Care Assistance Program under Missouri law would be represented by the Missouri Home Care Union for purposes of collective bargaining with state authorities. After the election was conducted, certain individuals challenged the election as having been conducted in violation of law and constitutional provision. The circuit court enjoined the State Board of Mediation from certifying the election in favor of the Union. The Union, the State Board of Mediation, and the Plaintiffs appeal. We reverse the ruling of the circuit court and remand the case with instructions that the election be certified.

### The Consumer–Directed Personal Care Assistance Services Program

The State of Missouri has undertaken the responsibility of providing home care assistance to Medicaid-eligible disabled individuals who could not live independently without such assistance. The program is funded by the federal government via Medicaid. *See, e.g.,* § 208.868. The Department has carried out this responsibility through the "Consumer–Directed Personal Care Assistance Services Program" ("the Program"), originally established pursuant to the now-repealed sections 178.661–.673 RSMo and now governed by sections 208.900–.951 RSMo (Cum.Supp. 2010).[1] The Program is managed primarily by the Missouri Department of Health and Social Services ("DHSS").

### The Quality Home Care Council and Collective Bargaining

In 2008, Missouri voters adopted by initiative an additional measure called the "Quality Home Care Act" ("Proposition B") sections 280.850–.871. The 2008 law added certain new provisions to the Program. Among the new provisions was one that introduced the concept of collective bargaining in behalf of home care workers statewide with a single entity. Section 208.862.3 specified that the home care workers ("personal care attendants") would be deemed, for purposes of collective bargaining (and only for the purposes of collective bargaining),[2] to be employees of a new entity called the Missouri Quality

---

1. All statutory references are to the Revised Statutes of Missouri 2000, as updated by the 2010 cumulative supplement, unless otherwise indicated. A previous personal care assistance program was established pursuant to sections 178.661–.673 RSMo.

2. The personal care attendants are accountable both to the consumers they serve and to the Department of Health and Human Services. *See* § 208.862 ("consumers shall retain the right to hire, fire, supervise, and train personal care attendants"). Local private businesses around the state (called "vendors") also perform some tasks as to the care attendants that would ordinarily be performed by employers, as explained more fully *infra.*

Home Care Council ("the Council"), created by section 208.856. The Council consists of eleven members appointed by the Governor with the advice and consent of the Senate. Six are to be current or former recipients of personal care services. Others are to be representatives of DHSS, the Missouri Centers for Independent Living, the Governor's Council on Disabilities, and the Governor's Advisory Council on Aging. § 208.856.2. The Council is a "public body," section 105.500, and personal care attendants are "employees" of the Council for collective bargaining purposes. § 208.862.3.

The Public Sector Labor Law (§§ 105.500–.530) provides, *inter alia*, that a "public body" has the duty to meet, confer, and discuss with labor organizations representing public employees. It provides for the discussion of proposals related to salaries and other conditions of employment. § 105.520. The representatives of the public body are also required to place in writing the results of such discussions, and to present them to the appropriate governing body for adoption, modification, or rejection. *Id.*

### The State Board of Mediation

Any issues with respect to the selection of collective bargaining representatives shall be resolved by the State Board of Mediation. *Id.; see also* § 105.500. The State Board of Mediation consists of five members appointed by the Governor and affirmed by the Senate. The Board is designed to provide neutrality in union-management relations. Two members represent unions, two members represent employers, and the fifth represents neither and is the chair. *See* § 295.030; *Parkway School Dist. v. Parkway Ass'n of Educ.*, 807 S.W.2d 63, 68 (Mo. banc 1991). In determining the details related to the conduct of elections, the Board is empowered to conduct contested-case hearings and adjudicate disputed issues. § 295.070. Any party aggrieved by a Board decision may seek judicial review. § 105.525.

Under Proposition B (the 2008 initiative measure adopted by voters), when a union seeks to be the exclusive bargaining representative of the personal care attendants, the State Board of Mediation shall conduct an election by mail ballot pursuant to Missouri Public Sector Labor Law to determine whether the personal care attendants wish to choose a union to represent them. Section 208.862.4 states in pertinent part:

> The sole appropriate unit of personal care attendants . . . shall be a statewide unit. . . . . The state [Board] shall conduct an election, by mail ballot, to determine whether an organization shall be designated the exclusive bargaining representative . . . for the statewide unit of personal care attendants . . . upon a showing that ten percent of the personal care attendants in said unit want to be represented by a representative. The Missouri office of administration shall represent the council in any collective bargaining with a representative of personal care attendants. Upon completion of bargaining, any agreements shall be reduced to writing and presented to the council for adoption, modification or rejection. . . .

Accordingly, a union seeking to be the exclusive bargaining representative of the personal care attendants must face an election by mail ballot conducted by the State Board of Mediation. The election shall determine whether the union will be designated the exclusive bargaining representative.

### The "Vendors"

In order to conduct an election to determine a collective bargaining representa-

tive, the Board must have cooperation and assistance from the "vendors." The vendors are those privately owned businesses around the state in various locations who serve the Program in various ways, including, among other things, recruiting and screening applicants, handling the payroll work for the care attendants, and performing other administrative work related to the care attendants and the consumers. *See* § 208.862.2; § 208.903.2; § 208.909.2 and .5. The vendors are compensated from the Program in accordance with the terms of their written agreement with DHSS and the requirements thereof. The vendors evidently have a financial interest in the issue of whether care attendants are allowed to collectively bargain, but Proposition B did not provide for any direct representation of vendors on the Council. Thus, it is not clear that the Council includes any persons whose interests may be adverse to collective bargaining, except to whatever extent the members of the Council from DHSS may seek to protect the interests of vendors as well as care attendants.[3]

### Background: the First Election—Spring 2009

After the passage of Proposition B in 2008, a newly organized labor union called the Missouri Home Care Union, AFSCME–SEIU,[4] filed a petition with the State Board of Mediation seeking an election in an attempt to be certified as the exclusive representative for the bargaining unit of personal care attendants. Chairman of the State Board of Mediation, James Avery, after compiling a list of personal care attendants, determined that the

Union met the ten percent (10%) showing of interest necessary to process the petition. No one disputes that determination. On May 13, 2009, Avery sent a letter to the Union and DHSS notifying them that the Union had met the ten percent showing of interest required and that the Board therefore would proceed with an election.

Subsequently, Chairman Avery conducted a conference with representatives of the Union and the Council. Upon agreement between the parties, Chairman Avery prepared, and the parties signed, a "Stipulation for Certification upon Consent Election."

### Stipulation by the Parties to the Election

The stipulation dealt with the manner of carrying out the election, covering comprehensively such items as:

- the provision of notice,
- the eligibility criteria,
- the secrecy of the ballots,
- the tallying of the ballots,
- the authorized observers and challengers,
- the run-off procedure (if necessary),
- the wording of the ballot, and
- other items.

Although the vendors will be financially affected by the potentiality of collective bargaining, the vendors did not participate in the stipulation process because the statutory scheme assigns a role to vendors that differs from the role of a true employer. *See* § 208.862–.909. Also, Proposition

---

3. As discussed more fully below, the typical procedures in a union representation election assume the existence of adverse interests between the union and the employer. None of the parties in this matter discuss the extent of adverse interests here, presumably because it is primarily a governmental and legislative matter.

4. The new union was formed as a merger of two existing unions representing service workers, the American Federation of State County and Municipal Employees and the Service Employees International Union.

B granted the vendors no specific representation on the eleven-member Quality Home Care Council, which is the "employer" for collective bargaining purposes.

Before the election, three vendors, who were opposed to any effort to establish collective bargaining, refused to provide lists of all eligible personal care attendants who earned income between January 1, 2008 and June 1, 2009. Another irregularity was that approximately 2,489 eligible personal care attendants were left off of the Board's list, because the Board inadvertently failed to update the list to include all of the personal care attendants who earned income between January 1, 2009 and June 1, 2009.

On July 21, 2009, after the deadline for voting, and the day before the ballots were to be counted, a vendor and a group of personal care attendants who had not been permitted to vote in the election filed a lawsuit to block the election, alleging a number of irregularities in the election, including the fact that some current personal care attendants did not have the opportunity to vote. The plaintiffs also asserted that the Board failed to promulgate formal rules for the election as it should have done pursuant to section 536.021 RSMo.

The trial court ruled in favor of the vendor and the care attendants opposing the election, and entered a temporary restraining order enjoining the Board from certifying the results of the election.[5] Thereafter, the Board, the Council, and the Union acquiesced to that ruling and agreed to hold a new election.

### Second Election—2010

On January 15, 2010, Chairman Avery again convened a preliminary conference with representatives of the Union and of the Council to discuss the time frame for conducting the second election and to determine the eligibility period for those personal care attendants who would be allowed to vote. There is a substantial degree of turnover among the persons who work as personal care attendants. Many are less than full-time and use their personal care employment primarily to supplement other income. Others work as personal care attendants only temporarily while seeking other employment. In view of those factors, the parties sought to determine an appropriate eligibility period. The representatives of the parties stipulated that the appropriate eligibility period for the re-run election would include "[personal care] attendants on the vendors' current list who *received any pay* from the Consumer–Directed Services Program ("the Program") during the last six months of 2009 (July 1, 2009 through December 31, 2009)." (Emphasis in original.) Chairman Avery accepted the parties' stipulation.

On January 19, 2010, the Board, DHSS, and the Council sent a letter to all of the vendors of the personal care attendants in the state directing them to turn over a list of names and addresses of personal care attendants in the Program within the six-month eligibility period by January 22, 2010. Despite the letter, and previous orders in earlier cases, this time four of the vendors (instead of three as previously) refused to produce the names and addresses of their personal care attendants. The Board moved quickly to subpoena the lists from the "hold-out" vendors and then moved to enforce those subpoenas in separate legal actions. Subsequently, the court ordered the four vendors to turn over their lists of eligible personal care attendants. After various enforcement actions by the

---

**5.** The Board was permitted to tally the election results. According to that tally, 2,729 voted "yes" to the union representation and 499 voted "no."

Board against a number of vendors, the Board eventually received the last list on March 26, 2010.

### Stipulation of the Parties for the Second Election

In the meantime, on March 16, 2010, at another preliminary conference convened by Chairman Avery, all of the election details not specifically dictated by regulation were discussed and agreed upon by the statutorily designated parties. At that time, the Board still did not have all the data on employees, although the Board anticipated obtaining the data soon. The Board invited the parties to consider alternatives to the Board's usual mail-ballot election process, including consideration of the procedures used by the Missouri Bar Association in its mail-in ballot election process. The parties chose instead to adopt the Board's usual process, because they agreed that using new procedures for a re-run election would be too confusing for the voters.

The parties directed the Board staff to draft the ballot and voting instructions, subject to the parties' approval. The parties discussed and agreed on the details of the election, including, again, the secrecy of the ballot, the wording of the ballot, the notices of election, the authorized observers, the tallying of the ballots, the post-election and the run-off procedures, and other items. The parties (the Union and the Council) finalized and agreed to another Stipulation for Certification Upon Consent Election ("stipulation"), which Avery approved. The stipulation again covered the same issues as those addressed in the previous election's stipulation.

### The Timing of Election Events

The March 16, 2010 stipulation provided for mailing the Notice of Election on April 6, 2010, because the Board did not, as of the date of the stipulation, yet have the final list of eligible personal care attendants. The Board did not receive the information for a final list until ten days *after* the stipulation was adopted. The stipulation also provided for the mailing of the ballots on April 15, 2010. The ballots were to be returned by May 3, and counted on May 5, 2010. The Board also contacted the vendors to gain information so as to be able to remove from the list of eligible voters any personal care attendants who quit, were fired, or otherwise were no longer employed. The final list included 13,151 eligible voters.

Because of vendor delay in providing the pertinent information, the parties and the Board decided against expanding the voter eligibility period to include personal care attendants who were new to the program *after* the January 1, 2010 cutoff. The parties concluded that any effort to expand the eligibility period would be impractical and would only cause further delays. Thus, the notification and ballots were mailed to eligible voters on April 15, 2010.

On May 5, 2010, which was the close of the voting period, the ballots were counted. The vote count showed 2,085 "yes" votes for the Union, 1,405 "no" votes against the Union, 138 void ballots, and 294 challenged ballots. Many of the 13,000 eligible voters did not vote. No one contends that there were any irregularities in the counting and recording of the ballots.

The Union thus prevailed in the election by 680 votes.

### Proceedings in the Circuit Court

The Plaintiffs, who are some individual personal care attendants employed under the Program, filed suit against the Board challenging the election immediately after the election. Each of the Plaintiffs had

performed some work in the Program *after* January 1, 2010 and before April 15, 2010, but not before the end of 2009, which was the cut-off date of eligibility to vote in the election. According to lists subpoenaed by the Plaintiffs, at least 2,600 personal care attendants began working in the Program between January 1, 2010, and April 15, 2010. Plaintiffs argued that these persons should have been eligible to vote, but were ineligible to vote in the union election because the cut-off date was December 31, 2009.

The Plaintiffs sought an injunction against the implementation of the election results. The Missouri Home Care Union intervened. On May 19, 2010, the trial court preliminarily enjoined the Union from seeking to commence collective bargaining until the court ruled on the Plaintiffs' motion for permanent injunction.

The facts were undisputed. The parties filed cross-motions for summary judgment and statements of uncontroverted material facts in support of their motions. On November 9, 2010, 2010 WL 6582092, the trial court denied relief on Plaintiffs' counts I, II, and IV of their petition, but granted relief on count III, finding that the Board was required to formally promulgate rules of procedure pursuant to Chapter 536 for the conduct of mail-in elections, and did not do so. The court held that the certification of the election of May 24, 2010, was unlawful and void. Cross-appeals were filed by the Plaintiffs, the Board, and the Union.

### Standard of Review

There is one standard of review that is applicable to all the points on appeal: the standard by which we review summary judgments. We review grants of summary judgment "essentially *de novo.*" *ITT Comm. Fin. Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). A party is entitled to summary judgment where there are no genuine issues of material fact, such that the moving party is entitled to judgment as a matter of law. Rule 74.04(c)(6).[6] The propriety of summary judgment is purely an issue of law; as the trial court's judgment is founded on the record submitted and the law, this court need not defer to the trial court's order granting summary judgment. *ITT Comm. Fin. Corp.*, 854 S.W.2d at 376.

### Analysis as to Counts I, II, & IV of the Petition

We will first address the issues raised by the Plaintiffs in their cross-appeal in the points related to counts I, II, and IV. Plaintiffs first contend that the trial court erred in granting summary judgment in favor of the Defendants on counts I and II of Plaintiffs' amended petition, which alleged that the personal care attendants were deprived of their right to organize and bargain collectively through a representative of their own choosing, and deprived of their right to due process of law in that they were not permitted to vote in the election.

### Right to Have Representatives of Their Own Choosing

■ Article I, Section 29 of the Missouri Constitution guarantees the right of employees "to organize and to bargain collectively through representatives of their own choosing." The Plaintiffs claim that because they were not allowed to vote, they

---

**6.** All Missouri Rules of Civil Procedure references are to Missouri Court Rules 2011, unless otherwise stated.

were denied any role in selecting bargaining representatives of their own choosing.

The Board, the Union, and the Council (the group that represents the personal care attendants) agreed that in order to be an eligible voter in the election, an attendant must have been on a vendor's "current list" and had to have received pay from the consumer-directed services program "during the last six months of 2009 (July 1, 2009, through December 31, 2009)." The Plaintiffs were all on a vendor's current worker list as of April 15, 2010, when the ballots were mailed out, but none had received program income during the last six months of the 2009, making them ineligible to vote.

The legislature has granted the Board the authority to give effect to and implement this constitutional right to bargain collectively under Missouri's public sector labor law. *See* § 105.525. In *Independence NEA v. Independence School District*, 223 S.W.3d 131, 136 (Mo. banc 2007), the Court held that public employees (as well as employees of private employers) had collective bargaining rights under Article I, Section 29 of the Missouri Constitution. *Id.* Thus, the Court concluded that the Public Sector Labor Law (§ 105.510) provides procedures for the exercise of the right to bargain collectively. *Id.*

The Plaintiffs suggest that the phrase "representatives of their own choosing" in Article I, Section 29 implies an election process for "representatives" that includes a right to vote by all persons who have a stake in the outcome. While ideally every election of a representative would include a vote by everyone with a stake in the outcome, we find no authority to the effect that it is a constitutional necessity under Article I, Section 29 that every person who may be directly affected by it be allowed to physically vote. Even in an in-person election, as opposed to mail ballot, the election is typically scheduled on a day that most workers are expected to be present, but seldom is it possible to find a day when everyone will get to vote. *See, e.g.,* NLRB Casehandling Manual, ¶ 11302.1; *Beck Corp. v. NLRB*, 590 F.2d 290 (9th Cir.1978).

It seems likely that the concern of Article I, Section 29 is that there would be no unreasonable or arbitrary barriers erected to the right of workers to establish collective bargaining with their employers. Collective bargaining can, of course, be accomplished by the acquiescence of the employer to a strong showing of support for a union among the employees, or it can be accomplished by an election conducted pursuant to law after a sufficient showing of support to warrant an election. The constitutional provision speaks of the workers' (plural) right to vote for representatives, and does not, by its terms, preclude such items as eligibility criteria that might exclude an individual from voting.

Elections, and not just union elections, typically have some sort of cut-off date for eligibility to vote. And it does happen with union elections. *See, e.g., NLRB v. Dalton Sheet Metal Co.*, 472 F.2d 257, 260 (5th Cir.1973). A reasonable and legitimate cut-off date is one factor that determines whether an individual has a legally recognized right to vote in the election as opposed to only a practical stake in the election. Because union elections involve different employers and workforces in different circumstances, it is common sense that eligibility issues (related to issues such as part-timers, probationary employees, field supervisors, recent hires, and on and on) are better addressed by adjudication and by stipulation of the parties to the election rather than by hard-and-fast government regulation.

For the mail-in ballot election, which was statutorily prescribed, the cut-off date

for eligibility would have been determined by adjudication if the parties had been unable to agree. And here the parties—the Union and the Council—did agree; so the cut-off was determined by them in the light of the circumstances that existed at that time, including the difficulty of securing a list of the individuals serving as personal care attendants in time to conduct the election. While the Plaintiffs here complain about the cut-off date, they fail to point to any evidence that there was anything arbitrary or suspect about the cut-off, or that there was a plot by the Board of Mediation to tilt the "playing field" one way or another.

Some of the vendors were very opposed to allowing such an election to be conducted. While we need not characterize the motives of the resisting vendors, it is obvious that the vendors were in a position to try to derail the unionization of the workers. Absent 100 percent cooperation by vendors, and absent perfect communication, including perfectly executed daily updates by vendors of new hires and new terminations during the voting period, there is no way to guarantee that all those currently employed as personal care attendants at the time of the election would be permitted to vote.

■ While Plaintiffs say that they do not intend for the constitutional rights protected in Article I, Section 29 to be taken to extremes, their proposed interpretation (and suggestion that the cut-off date should be the date of the election) is inconsistent with the practical realities of this case. Their interpretation of the constitution is also conspicuously inconsistent with the fact that unions have been able to use "authorization cards" or "card check" (also called majority sign-up) as an alternative to the election process applicable to private sector employment relations. See NLRB v. Gissel Packing Co., 395 U.S. 575, 596–97, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).[7] The same is true in public sector employment in Missouri.[8] And, of course, it is obvious that anyone hired *after* a union is certified is deprived of the right to vote for a different union to be a collective bargaining representative.[9] Thus, in both private sector employment and public sector employment, workers have never had a *guarantee* of the right to vote as an individual in a secret ballot election as to the selection of a union representative. *Id.*

The Board has promulgated rules that expressly require that a list of eligible voters shall be supplied to the Board *at least* fourteen (14) working days *prior* to the election. 8 C.S.R. 40–2.150. Such a rule is typical throughout union representation elections (and has been repeatedly affirmed by reviewing courts), even though it excludes employees hired after the eligibility cut-off date.[10] Agencies, like the

---

7. In *Gissel*, the employers had received authorization cards from a majority of the workers. The employers refused to extend voluntary recognition and proceeded to engage in unfair labor practices. The Court enforced the NLRB's order to the employers to bargain. The Court noted that the establishment of a bargaining obligation by means other than election was an accepted principle under both the Wagner Act (1935) and the Taft-Hartley Act (1947). *Gissel*, 395 U.S. at 597, 89 S.Ct. 1918.

8. There is no statutory limit on the ability of the Board of Mediation to use authorization cards as a means of determining majority status of a union. However, secret election is the preferred method. *City of Kirkwood v. Missouri State Bd. of Mediation*, 478 S.W.2d 690 (Mo.App.1972).

9. While certainly there are procedures by which a workforce can de-certify a union, we would assume that those procedures are not routinely employed.

10. See the NLRB cases cited at The Developing Labor Law, 5th ed. (2006), Ch. 10.-III.A.3.b, pp. 598–99 (John E. Higgins, Jr., *et al.*, ed.).

Board, and courts recognize that this approach best balances the relevant competing interests at stake in such elections. *See, e.g., Dalton Sheet Metal,* 472 F.2d at 260 ("it is an accepted rule that ... new permanent employees hired after the eligibility date are ineligible to vote, notwithstanding [that] ... they are employees in fact, and will most likely continue in their employment after the election" (internal quotations omitted)).

The Board directed all of the fifty-five vendors to supply the employee lists to it by January 22, 2010. Four of the vendors refused to comply with the request to provide employee lists, even though during the first failed election the resisting vendors were compelled by court order to do so. The Board again was forced to litigate the lack of vendor compliance to obtain court orders. As a result, the Board did not acquire a complete list of eligible voters until March 26, 2010. Immediately upon receiving the necessary lists, the Board set what appears to be the fastest election schedule possible, given the notice requirements in the Board's existing rules and the administrative demands of a mail-ballot election.

Changing or extending the eligibility cut-off date would have required the Board to again ask the vendors, both cooperative and obstructive, to provide new lists. This change would have further delayed an already drawn-out election process. There is no indication that the recalcitrant vendors would have gladly complied with the new request. While it is a goal to "ensur[e] that as many employees as possible with a legitimate interest in the outcome of the election would be able to cast ballots," *Delaware Cty. Solid Waste Auth. v. Pennsylvania,* 125 Pa.Cmwlth. 155, 557 A.2d 795, 797 (1989), timing and other procedural concerns will necessarily result in the exclusion of some interested employees.

The eligibility window must close at some point prior to the election. The eligibility cut-off here was not established in bad faith and was not purposely or even recklessly designed to exclude voters (or a class of voters) that otherwise would be eligible. Nor was the cut-off window unreasonable under the circumstances. Nor do Plaintiffs present any authority demonstrating that the cut-off was such as to be constitutionally defective.

It is obvious that there are practical realities related to every union representation election that must be taken into account by the parties and the labor relations agency, whether the employment involves the private sector or the public sector. Here, the circumstances were taken into account, and the election proceeded accordingly in accordance with the stipulation, which was realistic under the circumstances.

The delay between the cut-off and the actual conduct of the election was to a significant extent a result of the Plaintiffs' own success in challenging the first election. The Board and the election parties learned from that experience, and did not want to see the scenario repeated. Plaintiffs fail to show that their rights under Article I, Section 29 were violated.

### Due Process Violation

■ Plaintiffs also contended in their petition that the Board violated their due process rights under the Fourteenth Amendment of the U.S. Constitution and Article I, Section 10 of the Missouri Constitution. These provisions, mandating that no person shall be deprived of life, liberty, or property without due process of law, are treated as equivalents by the Missouri Supreme Court. *See, e.g., State v. Rushing,* 935 S.W.2d 30, 34 (Mo. banc 1996); *Belton v. Bd. of Police Comm'rs,* 708 S.W.2d 131 (Mo. banc 1986) (address-

ing Fourteenth Amendment due process claims and Article I, Section 10 claims as one). Under both provisions, the Plaintiffs must establish a deprivation by the government of a "constitutionally protected interest." *Mathews v. Eldridge,* 424 U.S. 319, 322, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

Here, the Plaintiffs allege that certification of the Union as the exclusive representative of the personal care attendants will deprive them of their property in form of mandatory union dues or other payments, as well as their liberty and property interests in their right to vote in the election and their right to participate or not participate in a union.

We fail to see that the Plaintiffs are able to demonstrate a protectable property interest or liberty interest affected by the Board's decision in this case. The Plaintiffs are not being forced to become members of a union. Missouri's Public Sector Labor Law plainly states that employees shall have the right to form and join labor organizations and also the right not to join.

> No such employee shall be discharged or discriminated against because of his exercise of such right, *nor shall any person* or group of persons, directly or indirectly by intimidation or coercion, *compel or attempt to compel any such employee to join or refrain from joining a labor organization* . . . .

§ 105.510 (emphasis added). Plaintiffs cannot, therefore, be required to join or participate in the Union, even if the Union is the exclusive representative of the personal care attendants.

Thus, the Plaintiffs' constitutional "freedom of association" is not violated by allowing the existence of a union as a collective bargaining representative. *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 235–37, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). It is true that the Union and the Council could agree at some future point to require all members of the bargaining unit—both union and non-union—to pay their "fair share" of the costs expended on collective bargaining representation; but such an event does not entail a violation of constitutionally protected rights. *Id.*; *see also Schaffer v. Bd. of Educ.,* 869 S.W.2d 163, 166–68 (Mo.App.1993) (finding that requiring non-union employees to pay their fair share of collective bargaining costs was not a violation of section 105.510 as it did not require union membership or payment of union dues).

The Court in *Abood* held that the collection of fees by the union from non-union public employees for the purposes of political advocacy or ideological purposes, *unrelated to collective bargaining activities,* was a constitutional violation. The Court held, however, that collecting and using fees for the purposes of *collective bargaining,* contract administration, and grievance adjustment was *not* a violation of the non-union members' First Amendment interests. 431 U.S. at 235–37, 97 S.Ct. 1782.

Here, because the Board's certification of the Union as the exclusive representative of the personal care attendants would not, by itself, impose any fee requirements, and because a "fair share of costs" agreement, if put in place, would be constitutional for the purposes of collective bargaining, no constitutional deprivation has occurred as a result of the election. *Id.*[11]

11. Plaintiffs also argue that they will be deprived of a liberty interest because they will no longer be able to contract as individuals for the terms of their employment if the Union and the Council enter into a collective bargaining agreement. The Plaintiffs cite no authority for this proposition. Article I, Section 10's guarantee of a liberty interest in the freedom to contract individually must be harmonized with Article I, Section 29's guaran-

Point I of Plaintiffs' brief is denied.

Point II of Plaintiffs' brief addresses the court's ruling on count IV of the Plaintiffs' Amended Petition, alleging a violation of section 208.862.4, which states in pertinent part: "The state board of mediation shall conduct an election, by mail ballot, to determine whether an organization shall be designated the exclusive bargaining representative as defined in subdivision (2) of section 105.500, RSMo for the statewide unit of personal care attendants under section 105.525...." The Plaintiffs argue that the directive in section 208.862.4 that the Board "conduct an election" "to determine whether an organization shall be designated the exclusive bargaining representative" presupposes a process that is sufficiently rigorous to be accurate and to comply with other legal standards. While we have no quarrel with that general statement, we find no reason to believe that statement expresses concerns having implications here. The Plaintiffs say that because the Board failed to properly define the eligibility period and to obtain a list of eligible voters that included everyone with a constitutional right to vote, the election was unlawful under section 208.862.4. These arguments are simply a reprise of the arguments addressed above. Plaintiffs fail to show that any right flowing from the statute is broader or greater than any right flowing from the constitution. We have already concluded that the Board did not act in contravention of constitutional rights in determining the eligibility period for the election. Accordingly,

we also hold that section 208.862.4 was not violated.

Plaintiffs' Point II is denied.

### *Count III*

We turn next to the arguments of the Board and the Union that the court erred in its ruling in favor of the Plaintiffs on count III of the Plaintiffs' amended petition. The Plaintiffs prevailed in the trial court on contentions that the Board violated section 536.021 and section 295.070 by conducting an election without formally promulgating rules for the Proposition B mail-ballot election. The Plaintiffs contended that formal rule promulgation for mail-ballot elections was required by the provisions of Chapter 536, the Missouri Administrative Procedures Act ("MAPA").

Section 536.010(6) defines a "Rule" as follows:

> **"Rule" means each agency statement of general applicability that implements, interprets, or prescribes law or policy, or that describes the organization, procedure, or practice requirements of any agency.**

Because the foregoing language is so broad as to encompass much of what an agency does, the statute goes on, in pertinent part, to specify certain things that are *not* included within the definition of "rule":

**The term ... does not include:**

tee of the right to collectively bargain. If Plaintiffs' interpretation were correct, Article I, Section 29 would inevitably be canceled by a single worker's right or a single employer's right under Article I, Section 10.

> The workman is free, if he values his own bargaining position more than that of the group, to vote against representation; but the majority rules, and if it collectivizes the employment bargain, individual advantages

or favors will generally in practice go in as a contribution to the collective result. We cannot except individual contracts generally from the operation of collective ones because some may be more individually advantageous. Individual contracts cannot subtract from collective ones....

*J.I. Case Co. v. NLRB,* 321 U.S. 332, 339, 64 S.Ct. 576, 88 L.Ed. 762 (1944).

**(a)** A statement concerning only the internal management of an agency and which does not substantially affect the legal rights of, or procedures available to, the public or any segment thereof;

**(b)** A declaratory ruling issued pursuant to section 536.050 [granting courts the authority to render declaratory judgments concerning the validity of a rule or a threatened application thereof], or an interpretation issued by an agency with respect to a specific set of facts and intended to apply only to that specific set of facts;

**(c)** An intergovernmental, interagency, or intraagency memorandum, directive, manual or other communication which does not substantially affect the legal rights of, or procedures available to, the public or any segment thereof;

. . . .

§ 536.010(6).

Rulemaking applies only to "state agencies," which are those public entities authorized to make rules or to adjudicate "contested cases." *See* § 536.010(8).[12] There is no dispute as to the fact that the State Board of Mediation is a "state agency" under Chapter 536, because it is authorized both to make rules and to conduct contested case hearings.

To lawfully adopt a rule, the state agency must use the statutory rulemaking procedures set out in Chapter 536, which give the public the procedural protection of knowing about rules in advance and providing the public with an opportunity to comment. § 536.021.1. Section 295.070 similarly mandates that the Board must adopt formal regulations to "prescribe the meth-

ods of procedure before it." § 295.070.1. One of the things specified in 536.010(6) that is *not* a rule is a case-specific agency adjudication ("an interpretation issued by an agency with respect to a specific set of facts and intended to apply only to that specific set of facts"). Such an adjudication is not a "rule" because it is not an agency "statement of general applicability." *Branson R–IV School Dist. v. Labor and Indus. Relations Comm'n,* 888 S.W.2d 717, 721 (Mo.App.1994). It is an "adjudication," which may result from a "contested case," which is defined by MAPA as "*a proceeding before an agency in which legal rights, duties or privileges of specific parties are required by law to be determined after hearing.*" § 536.010(4). An adjudicated determination, thus, *by definition,* is not "*a statement of general applicability that implements, interprets, or prescribes law or policy.*" § 536.010(6).

A statement of generally applicable policy that should have been formally adopted by rule, but was not, is null and void. § 536.021.7. An agency is liable for attorneys' fees in any litigation that establishes the agency's failure to pursue rulemaking. § 536.021.9.

The Supreme Court has said that the announcement by a state agency of a generally applicable policy or interpretation of law "that has future effect and acts on unnamed and unspecified facts is a 'rule.'" *Dep't of Soc. Servs., Div. Med. Servs. v. Little Hills Healthcare, L.L.C.,* 236 S.W.3d 637, 642 (Mo. banc 2007). Rules are, the Court has said, agency declarations that have the "potential, however slight, of impacting the substantive or procedural rights of some member of the public." *Id.*

---

**12.** Not every "state agency" is an "agency" for purposes of MAPA. See the broad definition of "agency" in section 536.010(2). "State agencies" is a narrower category. § 536.010(8).

(quoting *Baugus v. Dir. of Rev.*, 878 S.W.2d 39, 42 (Mo. banc 1994)).

Agencies, in carrying out functions, tend to operate *both* by declaring generally applicable regulations *and* by making case-specific adjudications. Occasionally it may not be entirely clear whether an agency decision adjudicates a matter applicable only to a particular party and a particular set of facts, or constitutes a rule or regulation designed to declare generally applicable policy or practice prospectively. If a state agency suddenly applies a new (but unpromulgated) generally applicable policy, even *within* a case-specific adjudication, the agency may be at fault for failure to promulgate the new policy. *See, e.g., Young v. Children's Div., State Dep't of Soc. Servs.*, 284 S.W.3d 553 (Mo. banc 2009).

To understand the concept of a "rule" within the meaning of Chapter 536, we refer to cases that provide some delineation. In *NME Hospitals v. Department of Social Services, Division of Medical Services*, 850 S.W.2d 71 (Mo. banc 1993), the Court held that a Department of Social Services (DSS) change in the method of calculation of the Medicaid reimbursement rate for hospitals (to exclude reimbursement of most in-patient psychiatric services) was a policy change involving a reimbursement standard of general applicability that applied generally to all participants in the Medicaid program. *Id.* at 74. The Supreme Court held that such a change in state-wide policy amounted to a "rule."

The *Little Hills Healthcare* case also involved Medicaid prospective reimbursements to Missouri Medicaid service providers. 236 S.W.3d at 639. In that case, Department of Medical Services (DMS), after twelve years of using one method of estimating "Medicaid days," for reimbursement purposes, abruptly, in 2003, chose to alter its calculation method. Then, in 2004, DMS again modified its method of calculation. The result was an estimated number that turned out to be "markedly different" from the actual 2004 numbers. *Id.* at 640.

The Supreme Court determined that the change in calculation methodology was a "rule," noting that the standard applies to "all providers participating in the Medicaid program." *Id.* at 642. The Court also rejected DMS's argument that the method of calculation did "not have future effect." *Id.* at 643. DMS's free choice to annually update or change its calculation methods meant that DMS *could apply its current methods indefinitely* into the future. *Id.* The Court thus saw the calculation method as a standard of general applicability having future effect, and the fact that DMS could freely decide to change its method the next year did not change that.

In *Young*, the Court dealt with the adjudication of the request by a particular set of adoptive parents (Mr. and Mrs. Young) to receive enhanced subsidies under a program to assist adoptive parents who adopt behavior-disordered children. 284 S.W.3d at 553. After considering the parents' application in a private meeting with a consultant, the Division denied the application. *Id.* at 554. The parents requested a hearing before the Division. *Id.* After the hearing, the Division affirmed the denial of the Young's request for participation in the higher level of subsidization. *Id.* at 557. Ultimately, the Supreme Court recognized that although the decision as to the subsidy in this particular instance was an individualized determination, the individualized determination was made based upon a set of standards or policies (apparently those suggested by the Division's consultant) that had never been promulgated as a "rule." *Id.* at 559–60. The Court noted that the standards potentially amounted to

generally applicable policy going forward. *Id.* at 560. The Court held that the "criteria and methodology the [D]ivision uses in determining a child's qualification for BFC subsidy under section 453.073 meets the definition of 'rule' under section 536.010(6) as an 'agency statement of general applicability that implements, interprets, or prescribes law or policy, or that describes the organization, procedure, or practice requirements of an agency.'" *Id.* The Court thus held that the Division's eligibility requirements must be promulgated under rulemaking procedures, or are void. *Id.* at 561.[13]

Somewhat similarly, in *Missouri Association of Nurse Anesthetists v. State Board of Registration for the Healing Arts*, 343 S.W.3d 348 (Mo. banc 2011), the Court determined that the state agency (the Board of Healing Arts) had adopted a generally applicable policy without promulgating it as a "rule." The case arose out of a controversy within the medical community about the use of advanced practice nurses for fluoroscopic anesthesia procedures. The Missouri State Medical Association (MSMA) requested that the Board of Healing Arts adopt prohibitions that would preclude a physician from delegating fluoroscopic anesthesia procedures to advanced practice nurses (including certified registered nurse anesthetists). *Id.* at 351–52. After considering the matter at a Board meeting, a letter was issued by the Board to the MSMA advising that it was the Board's "opinion" that the advanced practice nurses (APNs) "do not have the appropriate training, skill[,] or experience to perform [those] injections." *Id.* at 352.

The Board stated those who disagree could provide "documentation" to the contrary.[14] *Id.* The Board's "opinion" letter was published in the MSMA newsletter circulated to the MSMA physician members throughout the state. *Id.*

The Missouri Association of Nurse Anesthetists (MANA), joined by a physician, filed a declaratory action against the Board. *Id.* The plaintiffs contended, *inter alia*, that the Board's "letter ruling" was intended by the Board to be a statement of general applicability, and that the Board failed to adhere to the public rulemaking requirements. *Id.* After the trial court ruled in favor of the Board, the plaintiffs appealed. *Id.* at 353.

On appeal in the Supreme Court, the Court regarded the Board's decision as a ruling that was generally applicable to physicians and APNs in the state. *Id.* at 356–57. The Court also noted that the Board's expressed policy was not limited to a specific individual or set of facts, but had a future effect and potential impact on any and all physicians and APNs who wished to employ advanced practice nurses contrary to the Board's "opinion." *Id.* at 357. The Court determined that the letter ruling was not an adjudication on a case-specific set of facts, but was a statement of general applicability that prescribed policy. *Id.* The Court, therefore, said that the policy was required to be promulgated pursuant to the procedures of section 536.021 in order to have validity.

In order to promote values of fairness, efficiency, accountability, and quality in agency decision-making, agencies should

---

**13.** Presumably, the impact on the Youngs of the new and undisclosed policy was that the Youngs, who presented expert testimony at the hearing on their application, were unable to know in preparing for the hearing about the new criteria that the Division would employ in its adjudication.

**14.** The "public comment" to be received by an agency is not limited to "documentation," and is obviously solicited by more formal means than the newsletter article published in that case.

(if we understand the foregoing cases properly) distinguish between their quasi-legislative function (of adopting/formulating generally applicable policies and standards) and their case-specific, adjudicative function. We think the foregoing cases illustrate that if no differentiation is made, policies of general application which should be promulgated may not be promulgated, disadvantaging those who deal with the state agency. But it is also clear from those cases and others that not every action of a state agency is a "rule" requiring promulgation. *See, e.g., Baugus,* 878 S.W.2d at 39.

In each of the above cases in which the Court determined the agency action was a "rule," the Court said that the agency action involved a generally applicable policy with a broad prospective effect. If the Court had decided these cases differently, and had instead ruled that agencies could continuously change their minds about broadly applicable policies having future effect without having to provide notice and to seek public comment, the rulings arguably would have undermined the purposes of MAPA and could well have had a detrimental effect on both fairness and agency accountability.

The Plaintiffs in this case involving a union representation election desire for the court to place this case in the same category as the foregoing cases. However, whereas the foregoing cases presented scenarios in which there was a lack of agency openness and accountability, and hence potentially a lack of fairness, we do not see those dangers as being present in this case, for the reasons expressed below.

### The Board's Promulgated Election Rules

 Here, in accordance with section 295.070, the agency has promulgated rules dealing with elections. 8 C.S.R. 40, Ch. 2. Some of the items not covered in the rules obviously would be case-specific items that could be determined by adjudication or by stipulation between the competing parties. Among the Board's promulgated rules (8 C.S.R. 40–2.050–.080 and 8 C.S.R. 40.2.150–.160) are those that deal specifically with:

- the contents of a petition for representation
- the manner in which a petition is to be processed
- the process for determining a sufficient show of interest to warrant an election
- the content and timing of notices governing the designation of election observers
- tallying of the ballots
- use of secret ballot
- certification of results
- raising of challenges

The Board conducts a substantial number of representation elections every year,[15] and the record shows that the Board has previously conducted mail-ballot elections as well as in-person elections.

.Plaintiffs assert that the Board has adopted formal rules for "in-person" elections but not for "mail-in" elections. That assertion is facially plausible in view of the fact that the regulations say nothing about mail-in elections. However, there is an element of the assertion that is misleading. It is true that the Board has not *designated* a set of rules as rules for mail-ballot

---

15. For instance, the State Manual indicates that in a recent fiscal year, the Board processed sixty-three petitions for representation and conducted twenty-eight representation

elections. *See* Official Manual State of Missouri 2011–12, Executive Departments, 373, *available at* http://www.sos.mo.gov/BlueBook/2011–2012/_LaborIndust.pdf# labor.

elections, though it has published on its website a "Mail Ballot Voting Process" communication. But it is also true that the Board has not *designated* a set of rules for in-person elections. At the time the regulations were originally developed and adopted, the Board was anticipating in-person elections. However, the evidence was that the Board, since that time, has on multiple occasions applied the existing regulations to mail-in elections as well as in-person elections.

The Plaintiffs fail to specify any way in which anyone would be confused by the regulations. By their terms, the rules are generally applicable and adaptable to mail-ballot elections. We observe a few minor items which seem out of place in a regulation dealing with a mail-ballot election. For instance, the term "polls" in 8 C.S.R. 40–2.160(1) (dealing with observers at the "polls") must be interpreted in the case of a mail-ballot election to refer to observers at the Board's office, the place at which the mail ballots are opened and counted, as opposed to the place at which the ballot is marked.

It is not necessary to duplicate regulations when existing regulations can reasonably be applied to newly developed circumstances. *See Upton v. S.E.C.,* 75 F.3d 92 (2d Cir.1996). Since adjudication (or stipulation) of election details is routine in every case, there is little occasion for anyone to be confused or to anticipate that any subjective determination by the Board as to the election procedure may be arbitrary or unreasonable. It is understood that details not covered by the regulations will be determined by adjudication (or by stipulation). The regulations provide the general structural framework rather than all the details. The fact that the balloting in this case was to be by mail ballot (as directed by statute) was one of various circumstances to be taken into account in determining the details.

The Board's regulations not only supply the framework for the election process (as we have seen), but also specify the hearing procedure by which election details may be established on a case-by-case basis. *See* 8 C.S.R. 40–2.140 (setting hearing procedure for determining details); 8 C.S.R. 40–2.180 (permitting parties to stipulate to election details in lieu of a hearing). Those provisions obviously apply to the mail ballot process as well as the in-person voting process. Because of the fact that in this election the structural format was in place, and because of the fact that the adjudicative process (here accomplished by stipulation) resolved all other procedural processes of the election, it is evident that no alleged flaw as to rule-making played any role in this election. Accordingly, even if the Board would be well-advised to adopt formally promulgated rules applicable only to mail-ballot elections, we conclude that the Board's failure to do so had no impact, legally or otherwise, on this election.

### Unpromulgated Election Procedure Communications

In that regard, we turn to the contention of Plaintiffs that the Board's "Procedures Manual" (4th Rev.2009) and the "Mail Ballot Voting Process," which was posted on the website at *www.labor.mo. gov/sbm/ Elections/election_process_mail.asp,* are "rules" that must be promulgated.

The "Mail Ballot Voting Process" states in part as follows:

The parties will discuss the process of conducting the mail ballot election, including the best time to mail the ballots and when they will be due back to the [Board]. The following is the Mail Ballot Process suggested by the Board. The parties may agree to modify this

process, *subject to the approval of the Chairman or other Authorized Representative of the Board.*

The italicized portion of the last sentence raises a concern in light of cases like *Young* and *MANA, supra.* Although the first part of the sentence says that these items are "suggested" by the Board (and thereby implies that they are optional ideas), the next part of the sentence refers to changes being "subject to the approval of the Chairman or other Authorized Representative." A member of the public might wonder whether that is merely a reference to the Chair's routine approval of any reasonable procedure to which the parties have agreed by stipulation in lieu of adjudication, or if it tends to communicate to the public that there is some binding authority in this set of procedures. In other words, one might wonder what is being said about the likely instance in which one party to the election agrees with all the procedures set forth in the "Process" description, but the other party does not. Are the parties bound to the "Process" provisions unless they mutually agree otherwise, or does the quoted language simply mean that the disputed item becomes an issue to adjudicate at a hearing? Or does it mean that the Chair decides the issue (since the sentence says "subject to the approval of the Chairman") as though the Chair has a veto power of either side's demurrer? While we think we know what was intended in this communication (which is that it is merely a reference to the Chair's routine approval of any reasonable stipulation), it is not entirely clear. The website publication would have been clearer if it had said something like the following:

The following is the Mail Ballot Process suggested by the Board. This process is suggested because this process has been used before and the Board believes it is generally fair and works well.

However, the parties are free to seek other procedures that are different from this proposed process. The parties may agree together on a procedure. If they do not agree, the issue will be resolved by the Board's adjudication process.

If the Board really intended to say something like the latter, it should be clearer; or else the "Process" should be formally promulgated. In any event, that issue does not become dispositive as to this litigation because the election parties here agreed to every procedure, and there is absolutely no evidence that anyone felt bound by the "Process" description on the website.

The Plaintiffs also complain that the "Procedures Manual" published by the Board contains "rules" and should have been promulgated. The Manual contains a good deal of information about the promulgated regulations at 8 C.S.R. 40-2, and appears to be directed to Board staff, providing operational direction to the staff involved in processing cases. Its preamble uses language that Plaintiffs think suggests that the Manual is itself a "rule":

These are general guidelines that should be followed unless extraordinary circumstances occur which may cause the necessity to deviate from the guidelines.

The phrase "extraordinary circumstances" tends to make the Manual seem binding, and therefore to govern the rights of the public. The Manual, however, is not directed to the general public, and apparently is made available to the public only as an information item. Section 536.010(6)(c) provides that the following is not a "rule":

**(c) An intergovernmental, interagency, or intraagency memorandum, directive, manual or other communication which does not substantially affect the legal rights of, or proce-**

dures available to, the public or any segment thereof[.]

The Procedures Manual would appear to be an intra-agency memorandum of procedures for the staff to follow. We do not see that it substantially affects the legal rights of, or procedures available to, the public or any segment thereof. Although the language about "extraordinary circumstances" causing deviation from guidelines makes the Manual seem prescriptive, it appears that it is prescriptive to the staff of the Board of Mediation and not to the general public. Although, again, the introductory provision should be made clearer in this regard, we see no indication that the Procedures Manual must be promulgated.

■ While we assume that the Board should either promulgate its materials or else should more clearly rephrase the language thereof purporting to explain the purpose and effect of the publication, we recognize that administrative agencies are allowed deference in determining the degree of specificity required in the articulation of rules. *See, e.g., Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 96, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995) (no duty to promulgate regulations that address "every conceivable question"). Therefore, we hesitate to intrude excessively into issues which really made no difference in the election which is at issue here.

### Reasonable Basis for Approving the Stipulation

■ The two parties to the election freely adopted procedures by stipulation. We find no evidence that anything that they agreed upon was controlled in any way by the "Process" or the Manual. Nor is there any evidence that the Board Chair's approval of the parties' stipulation was governed by these items or by any other "underground regulation." While an agency decision inconsistent with the provisions of an unpromulgated rule may be void, the courts will not negate an agency decision where there is an independent, reasonable basis for the decision. *Bd. of Educ. of St. Louis v. Missouri State Bd. of Educ.*, 271 S.W.3d 1 (Mo. banc 2008). Here, Plaintiffs can point to nothing in the stipulation that was mandated or compelled by any unpromulgated rule; and the independent, reasonable basis for the agency decision was that the parties had stipulated.

Neither the Council, nor DHSS, nor the Union, have expressed any confusion, uncertainty, or dissatisfaction with the Board's regulations or with any procedural details of the election in this case. It is the Plaintiffs (who were excluded by the eligibility cut-off date), and the vendors (who were not provided a seat at the table before the Board of Mediation) that express dissatisfaction. The establishment of the eligibility cut-off date and the approval thereof by the Chair, is the limit of any claim the Plaintiffs might have that they were impacted by anything the Board did or did not do. It is impossible for us to see how the lack of promulgation of any alleged "rule" or procedure had any effect on the Plaintiffs' rights or was anything that warrants refusing to certify the election. The eligibility cut-off, as we have shown, was driven entirely by the practical circumstances, and therefore was properly handled by adjudication (stipulation) rather than by regulation. The details of the election procedures here determined (in this case, by stipulation) were strictly case-specific, and lacked general applicability and future effect. The election details were about as *ad hoc* and as unique in their impact as any agency determination could possibly be.

Even if the Board were to promulgate the "Mail Ballot Voting Process" as a rule,

or adopt some other rule in its place applicable to mail-ballot elections, it would still, in accordance with existing practice and regulation, contain a provision allowing the Board to approve any stipulation achieved by the parties to the election. An approval of a stipulation is based on the terms of the stipulation, which are necessarily *ad hoc.* Section 536.010(6) not only gives an affirmative description of what a rule *is*, but also gives a description of what *is not* a rule. Subsection (b) provides that an agency action is not a rule if it is

> *an interpretation issued by an agency with respect to a specific set of facts and intended to apply only to that set of facts.*

Here, the agency action was merely the approval of the stipulation reached by the Union and the Council. By its very nature, this was an agency action that applied only to a *specific set of facts* and was intended to apply only to that set of facts. There is absolutely no carry-over to the next election.[16]

### Approval of Stipulation

The Plaintiffs nevertheless complain that there were no promulgated standards to govern whether or not the Chair approved the stipulation. The Chairman testified that he understood that his decision in behalf of the Board as to whether to approve a stipulation was to be governed by law and "common sense." The Board Chairman was acting in behalf of the Board pursuant to the authority delegated to him, as the Board's neutral member. His decision, if not subject to review in any other way, is subject to judicial review to determine whether his decision is unreasonable, arbitrary, or capricious or involves an abuse of discretion. *Bd. of Educ. of St. Louis,* 271 S.W.3d at 12; *see also* § 536.150. The Chair did not act without a rational basis or without substantial evidence. Nor did he act whimsically, impulsively, or unpredictably in a "totally subjective manner without any guidelines or criteria." *See Bd. of Educ. of St. Louis,* 271 S.W.3d at 12. The Chair does apply sound lawful policy and common sense (and would accordingly reject any stipulation to the effect that voting privileges would be available only to those workers over forty years of age, or only to those with college degrees, or only to married workers, etc.).

The typical union representation election process is based on the assumption that the parties to the election process (employer and union) have interests that are somewhat adverse to one another. Using the adjudication and stipulation process to determine election details makes a good deal of sense. The approval of the stipulation, in any event, is a completely *case-specific, ad hoc* decision. Thus, there is no conflict or enmity between the Board's practice and Chapter 536.[17]

16. There is no argument made here that because of the fact that the adjudication/stipulation process assumes that the election parties (employer and union) have somewhat adverse interests, and that because Proposition B introduced an unusual dynamic by assigning the employer's role to the Quality Care Council, the existing election regulations and procedures were inadequate to ensure a proper election, and that the Board therefore violated some law or constitutional provision in failing to adopt formally promulgated rules just for such an election.

17. Plaintiffs cite the fact that there are standards that govern the exercise of discretion by the Board of Probation and Parole, and argue that similarly there must be express standards governing the Board's exercise of discretion with regard to the approval of the stipulation. We disagree for the obvious reason that here the parties to the election agreed on a stipulation in an entirely case-specific circumstance that will have no carry-over to how others are affected. There is no risk here, as there is in the parole context, that there will be unfairness resulting from the lack of standards.

The failure to promulgate a rule when a formal rule is required "voids the decision that should have been properly promulgated as a rule." *Little Hills,* 236 S.W.3d at 643. And in the *Young* case, that meant voiding the decision denying the parents' application for participation in the program where the denial was based on the unpromulgated criteria. 284 S.W.3d at 461. In *MANA,* the effect was to entirely invalidate the effect of the Board of Healing Arts' "letter ruling." 343 S.W.3d at 357.

Here, in contrast, the only decision or action of the Board was the approval of the stipulation of the parties as to the election details. As long as the approval of the stipulation is not shown by substantial and competent evidence to be unreasonable, arbitrary and capricious, we need not consider invalidating the election. *See Bd. of Educ. of St. Louis,* 271 S.W.3d at 12 (not necessary to reverse decision of the State Board of Education to revoke accreditation of school district where Board failed under Chapter 536 to promulgate the provisions of a policy manual, because the decision to revoke accreditation was supportable on other grounds that were not arbitrary, capricious, unreasonable, or an abuse of discretion).

We note that the Board of Mediation, like the NLRB, recognizes that the circumstances of every workplace and those of every work force are different. And that fact is very clear in this instance, which involves a statewide work force and the provision of in-home care services. The existence of such differences in work force and workplace is the very reason that both the NLRB and the Board of Mediation provide a standard regulatory framework, but allow the details of the election to be determined by adjudication (or stipulation). This practice is well-established in administrative law. *See, e.g.,*

§ 536.060 (contested case issues may be resolved by stipulation); *see also* NLRB Case Handling Manual, Part 2, Representation Proceedings ¶ 11084.1–.3.

Eligibility criteria, when not agreed by stipulation, are determined by a hearing participated in by the two party-antagonists (the union and the employer). *See, e.g., City of Columbia v. Missouri State Bd. of Mediation,* 605 S.W.2d 192, 193–94 (Mo.App.1980) (Board of Mediation determined, in adjudication, exactly which categories of employees would be included in the bargaining unit). In short, the theory of the statutory scheme was always that the competing interests of union and employer would produce either an adjudicated determination or a consent stipulation specifying the eligibility criteria that would help ensure an election result that reflects the views of the affected workers who should constitute the bargaining unit.

We understand why it appeared to the trial court that the "Mail Ballot Voting Procedures" should have been promulgated, but we need not specifically agree or disagree with that ruling because it is not necessary to the disposition of this case. The operative agency action here of approving the stipulation was adjudicatory, case-specific, and *ad hoc* in nature, subject to review only on the ground of being unreasonable, arbitrary, or capricious (which we have determined it was not). This is not a case in which there was any new generally applicable policy or set of criteria being applied that had the effect of resolving the election details and thus casting the result of the election into doubt. Accordingly, we grant the Board's and the Union's cross-appeals to the extent that they contend that the court erred in enjoining the certification. For the foregoing reasons, the election in this case remains subject to certification.

## Summary

The trial court properly rejected the claims of the Plaintiffs under Article 1, Section 10 and Article 1, Section 29 of the Missouri Constitution, and under the Fourteenth Amendment due process clause of the United States Constitution. The trial court properly rejected the claims of Plaintiffs under section 208.862.4. The trial court erred in determining that the election must be held invalid because the State Board of Mediation did not promulgate "rules" pursuant to Chapter 536 for mail-ballot elections. The Board did not violate the rule-making requirements of Chapter 536. In any event, even if rules for mail-ballot elections had been required to be promulgated, it would not have necessitated that the election be held invalid, because the only action of the Board that was conducted pursuant to allegedly unpromulgated rules was the approval of the stipulation.

Whether rules were promulgated or not, there would have been authority to approve the stipulation and there would have been no reason to disapprove the stipulation. The approval of the stipulation was, by its very nature, applicable only to a specific set of facts and could not constitute an interpretation of policy having future effect.

The Board's action in approving the stipulation was not governed by unpromulgated "underground" rules, although the Board published a "Mail Ballot Process," and a Procedures Manual. The Board's action in approving the stipulation was not unreasonable, arbitrary, or capricious, and did not involve an abuse of discretion.

## Conclusion

Because the election procedures employed by the Board did not violate any constitutional rights or statutory provisions, and because any failure of proper rule-making had no effect on the conduct of the election, we hold that the court erred in enjoining the certification of the election. We remand the case to the trial court with directions to vacate the injunction and to direct the Board of Mediation to certify the election results.

All concur.